**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION**

| | | |
|---|---|---|
| United Cutwater, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  3:22-cv-56 |
| | ) | |
| Auto Enterprise TIG Inc., | ) | |
| Yevgen Arutyunyan, | ) | |
| Omar  Zhandarbekuly, | ) | |
| Leonard Grayver, and the | ) | JURY TRIAL DEMANDED |
| Grayver Law Group, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiff, United Cutwater, LLC, by its counsel, for its Complaint for Damages and Other

Relief against Defendants Auto Enterprise TIG Inc., Yevgen Arutyunyan, Omar Zhandarbekuly,

Leonard Grayver, and the Grayver Law Group, P.C. alleges and states as follows:

### The Parties

1.      Plaintiff United Cutwater, LLC ("UC") is a limited liability company formed

under the laws of Indiana, does business throughout Indiana and many other U.S. States, and has

a principal place of business in Evansville, Indiana.

2.      Christopher Riley is the President and CEO of UC and resides in Missouri.

3.      Defendant Auto Enterprise TIG, Inc. ("AE TIG") is a Delaware corporation,

formed in February 2021, with a principal place of business in Burbank, California, and does

business in Indiana.  AE TIG is often referred to in the relevant documents (described herein

below) as the "Company."  References to the Company mean AE TIG.

4.      Auto Enterprise, LLC ("AE LLC/UK")[1] is a Ukrainian limited liability company, whose capital and assets are owned 100% by AE TIG. AE LLC/UK has a principal place of business in the Ukraine, and through its association with its parent company AE TIG and the owners or officers of AE TIG does business in the United States, including in Indiana.

5.      EV Future, LLC ("EV Future")[2] is a Ukrainian limited liability company, whose capital and assets are owned 100% by AE TIG.   EV Future has a principal place of business in the Ukraine, and through its association with its parent company AE TIG and the owners or officers of AE TIG does business in the United States, including in Indiana.

6.      Together, AE LLC/UK and EV Future are wholly owned subsidiaries of AE TIG. AE LLC/UK and EV Future are sometimes referred to by the Parties and in the Parties' documents as "the Subsidiaries."

7.      Defendant Yevgen Arutyunyan ("Eugene") is the Chief Executive Officer and Secretary of AE TIG, does business in Indiana, and resides in Montrose, California.

8.      Eugene owns the majority of the issued and outstanding shares of AE TIG's stock and is its only director.

9.      Defendant Omar Zhandarbekuly  ("Omar") has advised AE TIG with respect to matters described herein below, is an agent of or independent contractor to AE TIG, does business in Indiana, and resides in Phoenix, Arizona.  As part of his compensation, on about June

---

[1] Some of the transactional documents refer to Auto Enterprise, LLC as "AE UK."  Other times Auto Enterprise, LLC is referred to as "AE LLC."  To avoid confusion, Auto Enterprise, LLC is referred to as "AE LLC/UK" in this complaint.

[2] Some of the transactional documents refer to EV Future, LLC as "EV UK."  Other times EV Future, LLC is referred to as "EV Future."  To avoid confusion, EV Future, LLC is referred to as "EV Future" in this complaint.

14, 2021, AE TIG granted Omar options for the purchase of 320,000 shares of AE TIG stock at the exercise price of $0.00001 per share.

10.     Defendant Leonard Grayver ("Attorney Grayver") is an attorney licensed to practice law in California and resides in Burbank, California. Attorney Grayver is a partner in the Grayver Law Group.

11.     Defendant, Grayver Law Group, P.C. is a California law firm with offices in Santa Clara and Hermosa Beach, California.

12.     The Grayver Law Group and Leonard Grayver provide Russian-language services to clients on matters relevant to technology startups who want to enter the U.S. market.

13.     Leonard Grayver and the Grayver Law Group provided legal services to Eugene, AE TIG, and business entities owned or controlled by Eugene or AE TIG, including legal services in connection with the business transactions that are the subject of this action.

14.     Drake Star Partners is an investment banking and advisory firm located in New York, New York, and with offices in several other U.S. and international cities.  Drake Star Partners acted as investment advisor to Eugene and AE TIG in this Transaction.  Drake Star's Vice President, employee and/or agent Vitaly M. Golomb ("Vitaly") was the primary point of contact between Drake Star and the Plaintiff and transmitted information about AE TIG and the parties and transactions at issue in this Complaint from AE TIG, Eugene, and/or Omar to the Plaintiff UC.

15.     Dmytro Nikonov ("Dmytro") owns shares of AE TIG, owns or controls Autoenterprise PC ("AE PC") and its wholly owned subsidiaries (described below), does business in Indiana, and resides in Boca Raton, Florida.

**Jurisdiction and Venue**

16.     This is a civil action arising under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R § 240.10b-5), as well as other applicable federal and state laws.

17.     This Court has jurisdiction over the claims in this action that arise under the federal securities laws of the United States, including Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under the provisions of 28 U.S.C. § 1331.

18.     In connection with the acts, transactions, and conduct alleged herein, each of the Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail and interstate telephone communications.

19.     This Court has supplemental jurisdiction under the provisions of 28 U.S.C. § 1367 with respect to claims that arise under laws other than the federal securities laws and other laws of the United States.

20.     Venue is proper in this district under Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)) and 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the fraud or the effects of the fraud occurred in this district.

**The Organizational Structure**

21.     Dmytro owns or controls the "Autoenterprise" family companies located in Ukraine.

22.     A true and correct copy of an organizational chart provided by Dmytro to UC in January 2022 in connection with the Transaction (as defined below) shows the family of companies in which Dmytro is the ultimate beneficial owner is attached as Exhibit 1.

23.     As shown on Exhibit 1, Dmytro Nikonov was the owner of record and beneficial owner of 100% of the equity/ownership interest of EV Future and AE LLC/UK.

24.     AE TIG, the U.S. Company, was created by Eugene (working with Attorney Grayver and the Grayver Law Group) for the purpose of expanding sales of electronic vehicle ("EV") charging stations in the United States.

25.     At the time AE TIG was first formed by Eugene, Attorney Grayver, and the Grayver Law Group, neither Eugene nor AE TIG had any assets with which to develop, assemble, manufacture, sell, or distribute EV charging stations.

26.     On about August 5, 2021, Eugene contacted Dmytro about Eugene's idea for an EV charging station business in the U.S.

27.     Eugene and each of the other Defendants represented to UC that Eugene was a partner in Dmytro's Ukrainian Autoenterprise business, and that Eugene had been a partner of Dmytro since at least 2016. In fact Eugene was not affiliated with or a partner in Dmytro's Ukrainian Autoenterprise businesses.

28.     On about October 4, 2021, Dmytro, as owner of record and the beneficial owner of 100% of the equity/ownership interest of AE LLC/UK, and AE TIG entered into an Ownership Interest Transfer Agreement (the "AE LLC/UK Transfer Agreement") whereby Dmytro transferred all of his interest in AE LLC/UK to AE TIG, and AE LLC/UK became a wholly owned subsidiary of AE TIG. At the time of the transfer, AE LLC/UK was a shell company with no assets and no revenues.

29.     A true and correct copy of the AE LLC/UK Transfer Agreement is attached hereto and made a part of this Complaint as Exhibit 2.

30.     On about October 4, 2021, Dmytro, as owner of record and the beneficial owner of 100% of the equity/ownership interest of EV Future and AE TIG entered into an Ownership Interest Transfer Agreement (the "EV Transfer Agreement") whereby Dmytro transferred all of his interest in EV Future to AE TIG, and EV Future became a wholly owned subsidiary of AE TIG.  At the time of the transfer, EV Future was a shell company with no assets and no revenues.

31.     A true and correct copy of the EV Future Transfer Agreement is attached hereto and made a part of this Complaint as Exhibit 3.

32.     AE LLC/UK and EV Future were transferred to AE TIG for purposes of the SAFE transaction described below and were represented by AE TIG, its principals, advisors and agents, including Eugene, Omar, Attorney Grayver, the Grayver Law Group, Drake Star, and Vitaly as the subsidiaries who were at the heart of the project to expand the Ukrainian EV charging station business in the U.S. (the "Expansion Project"), and would provide the assets, including intellectual property necessary to carry out the Expansion Project.

33.     At all relevant times, Autoenterprise PC and its wholly owned subsidiaries, including AE Factory PC, actually held the assets, including intellectual property rights, necessary to carry out the U.S. Expansion Project.

34.     After the transfer of AE LLC/UK and EV Future to AE TIG, Dmytro continued to own or control 100% of the equity/ownership interest of Autoenterprise PC and each of its wholly owned subsidiaries, including AE Factory PC.  See Exhibit 4, depicting the organizational chart with annotations after the transfers.

35.     There has never been an agreement for Dmytro to transfer the assets of Autoenterprise PC or AE Factory PC to AE TIG.  Autoenterprise PC and AE Factory PC are still owned or controlled by Dmytro directly or by other entities Dmytro owns or controls.

**The Confidential Information Memorandum**

36.     In 2021, Eugene wanted to develop and grow an EV charging station business in the U.S.  He and the other Defendants planned to use AE TIG as a corporate entity to develop the EV charging station business operations and infrastructure in the United States and possibly elsewhere.

37.     To encourage investment in AE TIG and its Subsidiaries and in order to help fund their operations and growth, Eugene worked with Drake Star to build a financing structure using a simple agreement for equity or "SAFE" Agreement whereby an investor, like UC, would bring investment capital to fund the Company during its expansion and growth and subsequently receive an equity interest in the Company.

38.     A Confidential Information Memorandum (the "CIM"),[3] dated August 2021 and later updated in September 2021, was prepared for "AutoenterpriseEV" by AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group with the assistance of Drake Star and Vitaly.  The CIM was intended to provide information to potential investors and encourage their investment in AE TIG.

39.     "AutoenterpriseEV" is the name used to describe the EV charging station business described in the CIM and in subsequent communications from Eugene, Omar, Attorney Grayver, and/or the Grayver Law Group to UC.  AE TIG did business under the name "AutoenterpriseEV."

---

[3] The Autoenterprise EV CIM DRAFT (August 2021) v25 (the "CIM")  is a confidential document subject to nondisclosure terms.  References are made to the CIM, but it is not attached to this Complaint at this time to avoid breaching the nondisclosure and confidentiality terms.

40.     The CIM was presented to UC in the fall of 2021 by Drake Star through its Vice President Vitaly and was intended to provide general business and financial information about AE TIG/AutoenterpriseEV to UC as a prospective investor in the SAFE.

41.     The CIM describes Eugene as co-founder and Chief Executive Officer of "Auto Enterprise" or AutoenterpriseEV for the past two years.  The CIM describes Dmytro as co-founder of Auto Enterprise and its Chief Technology Officer.

42.     The CIM purports to provide actual (for January 2017-June 2021) and projected (for July 2021-December 2025) financial information for AutoenterpriseEV, and represents that expansion of that company into North America is already underway.  The only company affiliated with AutoenterpriseEV in August 2021 was AE TIG.

43.     The CIM and other presentations and descriptions of the investment opportunity in AE TIG/AutoenterpriseEV made to UC were made without the input, knowledge or consent of Dmytro. For example, Dmytro was never asked for and did not provide any financial statements for the CIM.

44.     A true and correct copy of a statement signed and sent by Dmytro to UC's counsel (Michael J. Messaglia) on about March 11, 2022, is attached hereto as Exhibit 5.

45.     Dmytro never saw the CIM until the SAFE transaction with UC closed.  Dmytro contacted Eugene via email on about December 11, 2021, asking Eugene to explain "what deal he cut with investors.  It was not what I agreed to with him when he contacted me in August 5/2020."  See Exhibit 5.

46.     Dmytro also contacted Drake Star's Vitaly on about December 27, 2021, asking for an explanation of the Transaction.

47.    Dmytro sent an email message to Eugene on December 11, 2021, with a list of questions regarding the Transaction, asserting his (Dmytro's) ownership of the relevant intellectual property, stating the need to properly document any transaction involving his companies, and further stating (in paragraph 7) "The financial plan and strategy are not known to me, and besides, I have concerns that they are not fully known to investors. Making my empty old companies into the ownership of AutoEnterprise TIG scares me, as it slightly suggests that investors want to take part in existing companies. It looks bad and I want to relieve myself of this responsibility with a document." When Dmytro got no response from Eugene, he forwarded the email to Eugene, Omar, Attorney Grayver, the Grayver Law Group, and Drake Star's Vitaly, as well as to UC's Chris Riley.

48.    A true and correct copy of the Dmytro's February 2, 2022-December 11, 2021, email chain is attached as <u>Exhibit 6</u>.

### The Agreements

49.    On about October 20, 2021, AE TIG issued a term sheet for a Simple Agreement for Future Equity (the "SAFE Term Sheet") in which it outlined plans to finance the Company by issuing and selling to investors up to $10.5 million of SAFEs, and described the terms and conditions under which  a future financing event would trigger conversion of the SAFEs to Preferred Stock in the Company.

50.     A true and correct copy of the SAFE Term Sheet is attached hereto and made a part of this Complaint as <u>Exhibit 7</u>.

51.    UC entered into the SAFE Agreement with AE TIG on about November 15, 2021, in which UC agreed to pay $8.0 million to fund the SAFE (the "the UC SAFE Agreement").

52.     A true and correct copy of the UC SAFE Agreement is attached hereto and made a part of this Complaint as <u>Exhibit 8</u>.

53.     At the same time on about November 15, 2021, UC and AE TIG entered into a side or letter agreement (the "Side Letter Agreement")[4] to supplement the terms in the UC SAFE Agreement as to UC.

54.     A true and correct copy of the Side Letter Agreement is attached hereto and made a part of this Complaint as <u>Exhibit 9</u>.

55.     UC and AE TIG also agreed that UC would provide consulting services to AE TIG as independent contractor to the Company to assist the Company in expanding its operations and developing infrastructure to support fully functioning operations within the United States by 2022, i.e. the U.S. Expansion Project.

56.     The parties drafted an Engagement and Consulting Agreement (the "Consulting Agreement"), effective as of November 15, 2021.  Although the Consulting Agreement was never fully executed, the parties agreed to and proceeded with the work described in the Consulting Agreement.

57.     A true and correct copy of the draft Consulting Agreement is attached hereto and made a part of this Complaint as <u>Exhibit 10</u>.

58.     As part of the consulting arrangement, the Parties agreed to and signed a "Tranche 1 Budget for the Expansion Project," which was also identified as "Exhibit A to the Side Letter Agreement"  (Exhibit 9) and is referred to herein as the "Tranche 1 Budget."  The Tranche 1 Budget called for $344,050.00 to be paid to UC for its consulting services.

---

[4] The Side Letter Agreement is sometimes referred to by the Parties as simply the "Side Agreement" or the "Letter Agreement."

59.     A true and correct copy of the Tranche 1 Budget (Exhibit A to the Side Letter Agreement) is attached hereto and made a part of this Complaint as <u>Exhibit 11</u>.

60.     The Parties agreed to the UC SAFE Agreement, the Side Letter Agreement, Exhibit A to the Side Letter Agreement (the Tranche 1 Budget ), and the consulting arrangement at about the same time and all were intended to be part of the same transaction.

61.     For ease reference, the Ownership Transfer Agreements, the SAFE Term Sheet, the UC SAFE Agreement, the Side Letter Agreement,  Exhibit A to the Side Letter Agreement (the Tranche 1 Budget), and the Consulting Agreement  (Exhibits 2, 3, 7, 8, 9, 10, and 11) are collectively referred to as the "Transaction Documents."

62.     The Parties agreed that the Side Letter Agreement (Exhibit 9) shall be governed by and construed according to the substantive law of the State of Delaware without regard to Delaware's conflicts of laws provisions that would otherwise require the application of any other state's laws.

### Inducement to Enter into the Transaction

63.     Throughout the parties' discussions leading up to the Transaction and execution of the Transaction Documents, the Defendants and their professional advisors represented to UC and its representatives that the Company had the means and assets to carry out the Transaction as described in the Transaction Documents, and in numerous meetings and communications among the Parties between at least August 2021 and the November 15, 2021, closing, as well as thereafter.

64.     Similar representations were made in the original and updated CIM that was prepared and presented by Drake Star on behalf of AE TIG to UC.

65.     The Side Letter Agreement  (Exhibit 9) includes the specific representation and warranty by AE TIG that it and its Subsidiaries (AE LLC/UK and EV Future) own or can acquire on commercially reasonable terms all of the assets necessary to carry out the business contemplated by the Expansion Project for which UC's investment was sought by Defendants and Drake Star.

66.     For example, Eugene stated to UC on about October 31, 2022, that he would go to Ukraine on about November 9, 2021, in order to complete the transfer of the two Ukrainian companies from Dmytro to the U.S. Company that AE TIG required for the development of the EV charging station business in the U.S.

67.     AE TIG's representatives Eugene and Omar represented to UC that the Company had over $12 million in revenues.  These same numbers were presented on the Company's behalf in the CIM prepared by Drake Star.  When asked for Company financial documents to substantiate the claims, the Company's actual written financial statements were promised but not provided, and instead Eugene and Omar manufactured financial statements, which Drake Star included in the CIM.

68.     As an inducement for UC's investment, in the fall of 2021, Eugene and Omar and/or Drake Star placed a 2020 Ukrainian tax return for AE Factory into the data room used for due diligence for the Transaction.  That tax return showed approximately $2.6 Million in revenues for AE Factory.  When UC asked Eugene and his cohorts to explain how the Revenue and Net Income lines on that tax return resulted in revenue for the Company's (i.e., AE TIG's) Subsidiaries (AE LLC/UK and EV Future), Vitaly (who speaks Ukrainian) responded, "There are no product level numbers there," meaning there were no product level revenue numbers for AE TIG's actual Subsidiaries, AE LLC/UK and EV Future in those tax returns.  It was the

company owned by Dmytro, i.e., AE Factory, whose tax return was in the data room and did show product level revenues. Nevertheless Eugene, Omar and Vitaly insisted that AE TIG and its Subsidiaries (AE LLC/UK and EV Future) had the financial and other means to carry out the Transaction in which they wanted UC to invest.

69.     While Eugene and AE TIG did acquire 100% of the capital stock of two shell companies (AE LLC/UK and EV Future) (see Exhibits 2 and 3), those acquisitions did not provide the Company with the "the assets, properties, leasehold interests and rights necessary to conduct the [B]usiness…" (see Exhibit 9 at paragraph 2c).  The Subsidiaries in the SAFE Agreement (EV Future and AE LLC/UK) have no assets and no revenue, do not own or have the intellectual property rights necessary to manufacture, assemble, or sell the charging stations, and have no means to manufacture, EV charging stations, operate the charging station business, or grow the business in the Ukraine, Europe, or North America.

70.     Rather, all of the assets, properties, leasehold interests, rights , and IP rights necessary to conduct the Business are held by other entities owned or controlled by Dmytro.  The other entities owned or controlled by Dmytro are not Company subsidiaries, and there is no agreement to transfer those entities, their assets or IP rights to the Company or Eugene.

71.     UC was induced by the Defendants, acting individually or in concert, to invest in a shell game.  The ownership of the Company and the identity of its Subsidiaries, their assets, revenues, legal status, and condition were misrepresented to UC, resulting in no real prospect to carry out the business contemplated by the Transaction and no real way for UC to realize the value of its investment.

72.     UC was induced by each and all of the Defendants, acting individually and jointly, and their professional advisors to proceed with the Transaction, advance funds, and enter

into and fund the Transaction because "time was of the essence," and on the basis that the Company was "solid," had the means to carry out the expansion project, and would provide all of the promised documentation at or after closing.

73.     Because the Defendants failed to provide documentation they promised and otherwise failed to perform as agreed (as explained below), UC did not advance the full $8.0 million contemplated by the SAFE, but did invest and advance a first draw from the Tranche 1 Budget (Exhibit 11), making substantial cash outlays and committing the time and expertise of its personnel in providing the approved consulting services to AE TIG and to obtain UL certification for the U.S. EV charging stations. UC's initial investment and cash outlays exceeded $750,000.

**Representations and Warranties by the Defendants**

74.     In the UC SAFE Agreement (Exhibit 8 at paragraph 3), the Company made representations that it was authorized to and had the means and ability to carry out the transactions contemplated in the agreement.

75.     Specifically, at paragraph 3(e) of the UC SAFE Agreement, AE TIG represented that "To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others."

76.     In the Side Letter Agreement, AE TIG made multiple representations and warranties to UC.  These representations and warranties are set forth in paragraph 2 of Exhibit 9, and address the ownership of the Company and its Subsidiaries, the financial condition, assets

and revenues of the Company, the intellectual property rights of the Company, the Company's legal status and compliance with applicable laws, among other things.

77.     As stated in paragraph 2 of the Side Letter Agreement (Exhibit 9), the representations and warranties were made at the time of execution of the Side Letter Agreement on November 15, 2021, and each representation and warranty was made again each and every time UC made a payment toward the Purchase Amount (as defined in paragraph 3 of the Side Letter Agreement).

78.     Each representation and warranty survives the closing of the UC SAFE Agreement and the closing of the Transaction.

79.     Each representation and warranty is made by the Company and is not "affected or diminished" in any way by any due diligence or investigation by the Investor (UC). (See Exhibit 9, Side Letter Agreement, para. 2.)

80.     Eugene signed the Side Letter Agreement on behalf of AE TIG as its "Chief Executive Officer."

**Misrepresentations about Ownership**

81.     Throughout the period leading up to the closing of the Transaction, Eugene represented to UC that he was the owner of and operated AE TIG and its wholly owned Subsidiaries, including EV Future and AE LLC/UK, and that as the owner of the Business, he had all of the authority and access to information of a business owner, and he could cause the business he owned to take the actions contemplated by the Transaction and to cooperate with the investor, UC.

82.     During the due diligence period for the Transaction,  Eugene told UC representatives that he has been affiliated with Autoenterprise Ukraine since 2016, and also

claimed he was one of three founding partners in the Ukrainian business  responsible for manufacturing and managing the implementation of 5500 charging stations in Ukraine, Europe, and the U.S.

83.    Having represented himself as a principal with substantial responsibility for the business, Eugene knew or should have known the extent of the revenue and assets of the Company, the identity of all of the Company's subsidiaries, and the extent of their business, assets, and revenues.

84.    In fact, Eugene had no role in the ownership or management of Dmytro's Autoenterprise family of businesses in Ukraine.

85.    AE TIG represents and warrants in the Side Letter Agreement (Exhibit 9 at paragraph 2c) that AE LLC/UK and EV Future are its wholly owned Subsidiaries and that AE TIG itself and through its Subsidiaries has the assets and means to carry out the Business contemplated by the Transaction.

86.    Paragraph 2c of the Side Letter Agreement (Exhibit 9), states:

> The Company owns 100% of the capital interests of Auto Enterprise, LLC ("AE UK"), a Ukrainian limited liability company, and EV Future, LLC ("EV UK", together with AE UK, collectively, the "Subsidiaries"), a Ukrainian limited liability company, free and clear of any claims or liens. The Company and the Subsidiaries own, free and clear of any claims or liens, or can acquire on commercially reasonable terms, all of the assets, properties, leasehold interests and rights necessary to conduct the business (the "Business") contemplated by that certain "Autoenterprise EV CIM DRAFT (August 2021) v25" (the "CIM").

87.    Similar representations were made in the CIM as an inducement to UC to enter into the Transaction.

88.    UC reasonably relied on the information and representations presented in the CIM and provided to it in connection with the CIM and the due diligence process.

89.     Neither AE Factory nor AE PC had a signed an ownership interest transfer agreement with AE TIG, and thus the deal with UC did not include those entities as "Subsidiaries."

90.     AE TIG acquired two subsidiaries with no assets and no revenues, but it did not have any agreement or arrangement with Dmytro that would enable AE TIG to purchase the necessary products and intellectual property rights from Dmytro's other businesses, making AE TIG a worthless shell with no relationship with the products it purports to sell.

91.     In the fall of 2021, AE TIG and Eugene and Omar represented that certain patents for the charging station technology had already been filed in the U.S. and that other intellectual property rights of the Ukrainian companies would be transferred to the U.S. Company, i.e., to AE TIG, pending resolution of certain tax matters in the Ukraine.

92.     All of the assets, properties, leasehold interests, and rights necessary to conduct the Business are held in AE PC and its subsidiary AE Factory.  Dmytro owns or controls AE PC, AE Factory, and other related business entities, and Dmytro did not agree to transfer these entities or their assets or intellectual property rights to AE TIG.  No Defendant has any interest in AE Factory or AE PC, and none had any prospect of " acquir[ing] on commercially reasonable terms, all of the assets, properties, leasehold interests and rights necessary to conduct the business (the 'Business') contemplated by that certain 'Autoenterprise EV CIM DRAFT (August 2021) v25] (the 'CIM')" as stated, represented, and warranted in Paragraph 2c of the Side Letter Agreement (Exhibit 9).

93.     Exhibit 4 shows the "bait and switch" game played with the Subsidiaries. Each and all of the Defendants and their professional advisors knew or should of have known of this deception, and each participated individually, and jointly in this shell game.

94.     Contrary to representations in the CIM and other communications to UC, Eugene was not a partner of Dmytro for the last five years, but rather Eugene approached Dmytro in 2020 to ask if Dmytro would like to expand to the United States.  Eugene attempted to broker a deal for businesses he did not own or control.

95.     By including EV Future and AE LLC/UK, and not including AE Factory and AE PC, as the subsidiaries of AE TIG, Defendants and those acting in concert with them, individually and jointly, misrepresented the structure and foundation of the Company and induced UC's investment under false pretenses.

**Misrepresentations in the Financial Statements**

96.     At paragraph 2a of the Side Letter agreement (Exhibit 9), AE TIG represented and warranted that: "Immediately prior to the issuance of the SAFE, the current capitalization of the Company is set forth on the capitalization table attached hereto as Schedule A."  Schedule A was promised but never provided to UC.

97.     The Side Letter Agreement (Exhibit 9) stated at paragraph 2f:

> The financial information of the Company and the Subsidiaries provided
> to the Investor, including the CIM and 'AEV_Consolidated Financial
> Model (10.25.21upd)_vDSP', is true, complete and accurate in all material
> respects and presents fairly in the financial condition and results of
> operation of the Company and the Subsidiaries as of the dates thereof and
> for the period referred to therein; provided, however, the Company does
> not warrant that it will achieve any results projected in the CIM.

98.     The financial information and financial statements provided by Eugene and/or Omar for the Company for the Transaction and other financial information described in or provided in connection with the CIM and the Side Letter Agreement including the information referred to in Exhibit 9 at paragraph 2f are false and misleading.

99.     For example, the CIM and other communications provided to UC during the due diligence period by Eugene, Omar, and those working with them, stated that the current revenues associated with the Ukraine charging station factory were more than $13.0 million.  The consolidated financial statements in the CIM showed 2020 Actual Revenues for the Ukraine EV charging station factory of  $13,799,007.

100.     On about October 15, 2021, UC's CEO Christopher Riley sent a due diligence document request to AE TIG, through AE TIG's investment advisor Drake Star, asking for multiple documents to support the claim AE TIG had over $13 million in revenues.  On October 25, 2021, UC was pressured by the Defendants and by Vitaly, Drake Star's lead banker for this Transaction, to close the Transaction without further delays because the level of due diligence UC was seeking was "insane."  In an effort to accelerate the due diligence process, it was represented by the Defendants and Vitaly, that many items were "not available," or would be provided after closing and initial funding, pending completion of paperwork in Ukraine (see paragraph 66 above).  Mr. Riley prepared a follow-up document, "Closing Issues AEV – United Cutwater.pdf" in November 2021 and sent it to Vitaly and Drake Star asking AE TIG and its representatives to respond to the list of issues that needed to be resolved.  These issues were never resolved by Drake Star or any of the Defendants.

101.     When translated into English after closing, the tax returns provided by Eugene did in fact show product level numbers and were consistent with the financial statements later provided by Dmytro but were not consistent with the Consolidated Financial Statements included in the CIM.

102.     In January 2022, UC obtained 2020 financial statements from Dmytro for AE Factory that showed 2020 revenues of about $2,474,075 or less than 20% of those presented in

the CIM and as represented by the Defendants, including Eugene and Omar, for the Ukraine charging station company.

103.    The 2020 financial statements provided by Dmytro, and the organizational chart provided by Dmytro, show revenues for the factory in Ukraine are generated in AE Factory, not in EV Future or AE LLC/UK.

104.    Prior to closing the Transaction, Eugene told UC he had an immediate need to close the Transaction and needed to obtain $10,000 before closing so he could go back to Ukraine and sign certain documents necessary to finalize the transfer of the assets and IP rights to the Company.  In fact, Eugene and AE TIG had no interests or way to sign anything to effectuate any such transfer, and obtained money from UC under false pretenses.  Eugene and Omar used the money UC advanced for the November trip to Ukraine for their own personal gain and benefit.

105.    Eugene and Omar repeatedly claimed during the due diligence period that there was an immediate need to fund and close the Transaction quickly.  For example, Eugene and Omar stated they needed to cash to buy 5G Modems that had been backordered for six months and were needed for the charging stations.

106.    Drake Star threatened to cancel the deal and "move on" if UC did  not sign the Transaction Documents without further questions or changes and fund the Tranche 1 Budget the same afternoon.  As a result of the pressure, UC closed the Transaction and wired $236,200 to Eugene and Omar immediately after closing for these "critical" expenses.

107.    In fact, 5G modems were never a part of any of the EV charging stations.  Eugene and  Omar had nothing to do with Dmytro's factory operation which had already ordered 4G modems many months ago.

108.    It appears that funds that were purportedly urgently needed for the EV charging stations were used for by Eugene and/or Omar for their personal gain and benefit, and despite repeated requests neither Eugene nor Omar has provided any accounting for the use of these funds.

109.    UC's representatives asked Attorney Grayver on multiple occasions for the Company's bank statements and an accounting of the use of the Tranche 1 disbursements.

110.    No bank account documents and no accounting records showing expenditures or disbursements for the Tranche 1 funds has ever been provided to UC.

### Misrepresentations about the Manufacture, Assembly, and Leasing of the Charging Stations

111.    AE PC owns or controls all of the intellectual property rights for the manufacture, assembly, and leasing of the EV charging stations in Ukraine.

112.    AE PC owns AE Factory, the entity where the leasing stations are actually manufactured and assembled.

113.    Neither AE LLC/UK nor EV Future have any assets, revenue, manufacturing equipment, or other capacity or means to manufacture or assemble charging stations.

114.    Dmytro, who owns and controls AE PC, stated to UC in 2022 that he has never expressed his willingness or intent to transfer the capacity to manufacture or assemble EV charging stations from AE PC to AE TIG or any of its subsidiaries.

115.    AE TIG represented to UC that EV Future owned 501 charging stations.

116.    According to Dmytro and his organizational chart, (Exhibit 1), AE PC is the company leasing about 475 EV charging stations installed on rented properties and generating income from charging station clients in Ukraine.

117.    Neither AE TIG, AE LLC/UK, nor EV Future has any assets, EV charging stations, intellectual property rights for the charging stations, manufacturing or assembly capacity, and none of them have any EV charging stations or rights to EV charging stations which they could lease to any other person or entity.

118.    Leonard Grayver, an attorney for AE TIG, and his law firm Grayver Law Group issued an opinion letter to UC in connection with the Transaction.  In October 2021, Attorney Grayver represented and stated to UC and its representatives that he had reviewed some of the lease agreements for the EV charging stations and was satisfied that they were valid.

119.    Leonard Grayver  told UC's representatives on about October 31, 2021, that as part of his due diligence in organizing AE TIG as a Delaware corporation and in preparation for transferring certain assets from Ukraine to the U.S. Company (i.e., to AE TIG and/or its Subsidiaries), he had personally reviewed the documents assigning intellectual property rights for the EV charging station technology as well as various lease agreements for EV charging stations physically located in the Ukraine.  Attorney Grayver assured UC's representatives that the business was real and would have the intellectual property rights and wherewithal necessary to develop the U.S. market.

120.    UC relied on the representations of Attorney Grayver and his law firm that he had reviewed a sample of the lease agreements and his assurances that he was satisfied that the leases were what they purported to be.

121.    Attorney Grayver failed to tell UC that neither AE TIG, AE LLC/UK, nor EV Future was a party to any lease agreement he had reviewed.  In fact AE TIG, AE LLC/UK, and EV Future are not parties to any EV charging station lease agreement.  Attorney Grayver and his

law firm did not tell UC that the leases he purportedly reviewed were made with another company or entity that was not part of the Transaction.

122.    Attorney Grayver and the Grayver Law Group issued an opinion letter for the Transaction for the benefit of UC.

123.    A true and correct copy of the Opinion Letter is attached  as Exhibit 12.

### Legal and Tax Issues for AE LLC/UK

124.    At one time AE LLC was an auto import business, but at least from 2021 until now, it has had no operations and has no assets. AE LLC/UK appears to have been investigated in Ukraine for illegally importing cars and failing to pay tariffs or taxes. This investigation was not disclosed to UC, although it appears that this criminal investigation was still pending at the time of execution of the Transaction Documents.

125.    In paragraph 2g of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that:

> There is no claim, action, suit, proceeding, arbitration, complaint, charge or, to the Company's and the Subsidiaries' knowledge, investigation pending or currently threatened (i) against the Company or the Subsidiaries, or any officer or person of the Company or the Subsidiaries arising out of their employment or board relationship with the Company or the Subsidiaries, (ii) to the Company's and the Subsidiaries' knowledge, that questions the validity of the SAFE or this Letter Agreement or the right of the Company to enter into them, or to consummate the transactions contemplated by the SAFE and this Letter Agreement or (iii) that would reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the Company's or the Subsidiaries' business, assets (including intangible assets), liabilities, financial condition, property or results of operations (a "Material Adverse Effect").

126.    That statement in paragraph 2g was false at least as to Subsidiary AE LLC/UK because AE LLC/UK appears to have a tax judgment against it, and it or those affiliated with it were fined the equivalent of several million dollars by Ukrainian taxing authorities.

127.     Paragraphs 2h, i, j, k and l of the Side Letter Agreement made further representations and warranties about the Company and its Subsidiaries that are false at least as to AE LLC/UK.

128.     In paragraph 2h of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that:

> The Company and the Subsidiaries are each in material compliance with all laws, regulations, directives, statutes, subordinate legislation, common law and civil codes of any jurisdiction in which the Company or the Subsidiaries conducts business, all judgments, orders, notices, instructions, decisions and awards of any court or competent authority or tribunal and all codes of practice having force of law, statutory guidance and policy notes in each case to the extent applicable to the Company or the Subsidiaries, or any of them as the context requires, the failure to comply with which would have a Material Adverse Effect.

129.     In paragraph 2i of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that:

> The Company and the Subsidiaries have not received, and are not aware of the existence of, any inspection report, notice of adverse finding, warning letter, untitled letter, or other correspondence with, or notice from, any federal, provincial, state, municipal, local or foreign governmental or regulatory authority or court or arbitrator in any jurisdiction, alleging or asserting the Company or the Subsidiaries are in noncompliance with any applicable laws or regulations.

130.     In paragraph 2j of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that: "The Company and the Subsidiaries have not undertaken any activity (a 'Company Activity'), unless such Company Activity: (i) is legal in the jurisdiction(s) where the Company or the subsidiaries operate; and (ii) is legal in the jurisdiction(s) where it is undertaken."

131.     In paragraph 2k of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that:

The Company and the Subsidiaries have no material liabilities or obligations, absolute or contingent (individually or in the aggregate), except (i) obligations and liabilities incurred after the date of incorporation in the ordinary course of business that are not material, individually or in the aggregate, (ii) obligations under contracts made in the ordinary course of business that would not be required to be reflected in financial statements prepared in accordance with GAAP consistent with past practice, and (iii) liabilities reflected in the financial statement or other documentation otherwise made available by the Company.

132.   In paragraph 2l of the Side Letter Agreement (Exhibit 9) AE TIG represented and warranted that:

The Company and the Subsidiaries have complied with applicable tax law and timely filed all tax returns required to be filed by it with appropriate federal, state, and local governmental agencies, except where the failure to do so would not have a Material Adverse Effect. Such returns and reports are true, correct, and complete in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and all other taxes due and payable by the Company or the Subsidiaries on or before the date of the issuance of the SAFE to the Investor have been paid or will be paid prior to the time they become delinquent. There are no material outstanding tax liabilities. The Company and the Subsidiaries have not been advised (i) that any of its returns have been or are being audited as of the date hereof or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state, or local taxes.

133.   AE TIG has breached each of the representations in paragraphs 2a, c, e through l of the Side Letter Agreement (Exhibit 9).  AE TIG remains in breach each of these representations and warranties, particularly as to AE LLC/UK.

**Misrepresentations about Intellectual Property Rights**

134.   In the Side Letter Agreement (Exhibit 9) at paragraph 2d, subparts A through E, AE TIG represented and warranted that:

A.  Any and all patents, invention disclosures, copyrighted materials, trademarks, trade secrets, know how, software, and the like, and any and all applications therefore (together the "Intellectual Property"), whether registered or unregistered, that is currently used in the Business and is material to or necessary for the operation of such Business (the "Company Intellectual Property") is either owned by the Company or the

Subsidiaries, free and clear of any and all liens, or licensed to the Company or the Subsidiaries pursuant to a valid and enforceable written contract.

B.  The Company and the Subsidiaries own and possess or have the right to use pursuant to a valid and enforceable written Intellectual Property license, all software used in the operation of the Business.

C.  Neither the Company nor any of the Subsidiaries is infringing upon, misappropriating, diluting or otherwise violating in any respect the Intellectual Property rights of any third party.

D.  To the knowledge of the Company and the Subsidiaries, no person or third party is misappropriating, infringing upon, diluting or otherwise violating, in each case in any material respect, any of the Company Intellectual Property owned by or exclusively licensed to the Company or the Subsidiaries.

E.  All Company Intellectual property owned by or developed by and/or for the Company and the Subsidiaries or any of its Subsidiaries was developed by (i) employees of the Company or its Subsidiaries within the scope of their employment or (ii) independent contractors who have entered into written agreements with, the Company or the either of the Subsidiaries that assigned all right, title and interest in and to any Intellectual Property developed to the Company or the Subsidiaries. No employee or independent contractor of the Company or any of the Subsidiaries has entered into any contract that restricts or limits in any way the scope of the Company Intellectual Property or requires the employee or independent contractor to transfer, assign or disclose information concerning the Company Intellectual Property to anyone other than the Company or any of the Subsidiaries.

135.    All of AE TIG's representations and warranties with respect to intellectual property rights were false when made and AE TIG remains in breach of each of these representations and warranties.

136.    AE TIG has no intellectual property rights for manufacture, assembly, and sale or lease of the charging stations that are the subject of the Transaction.

137.    AE PC or AE Factory and/or their principals own or control the intellectual property rights for the charging stations, and it has not assigned, transferred, or licensed these rights to AE TIG, EV Future, or AE LLC/UK.

138.    A document purporting to be a "Confidentiality and Intellectual Property Assignment Agreement" was purportedly entered into by AE TIG and Dmytro on about March 10, 2021.

139.    A true and correct copy of the purported Confidentiality and Intellectual Property Assignment Agreement (the "Dmytro Agreement to Assign IP") is attached hereto as Exhibit 13.

140.    A document purporting to be an "Assignment of IP and Other Assets" was also purportedly entered into by AE TIG, Dmytro, and Dmytro's wife on about March 10, 2021, although the document is not signed by Dmytro's wife.

141.    A true and correct copy of the purported "Assignment of IP and Other Assets" (the "Dmytro IP Assignment") is attached hereto as Exhibit 14.

142.    Dmytro has denied that there is a valid agreement to assign intellectual property rights or a valid assignment of intellectual property rights from him or his companies to AE TIG.

143.    Neither AE TIG, EV Future, nor AE LLC/UK own, control or have a license to use the intellectual property necessary for the EV charging stations.

144.    In the Side Letter Agreement (Exhibit 9) at paragraph 2e, AE TIG represented and warranted that: "There are no circumstances, except completion of necessary financing, that would prevent the Company from being able to operate, manufacture and sell chargers in the United States or Ukraine." That statement was false when made and remains false.

**Consulting Agreement and UL Certification for Charging Stations**

145.    The Company and UC also agreed to a consulting arrangement as a material part of the Transaction.  The intent of the consulting arrangement was, among other things, to assist "The Company [] in the process of expanding its operations and developing infrastructure to support fully functioning operations within the United States by the end of Fiscal Year 2022 (the 'Expansion Project')."  See Exhibit 10.  Although the Consulting Agreement was not signed, the same promises and representations were made orally by Eugene, Omar and AE TIG to UC on more than one occasion and the Tranche 1 Budget was approved by all parties.

146.    UL Certification is integral to the sale or lease of the EV charging stations in the United States.[5]  A portion of the revenue from the sale of EV charging stations in the U.S. was to be paid to UC as a means for it to recoup a portion of the monies it invested.

147.    Shortly before the November 15, 2021, closing, Eugene stated that the UL Certification process was within weeks of completion.  Vitaly and Eugene pressured UC to close the Transaction, and both of them assured UC that the UL Certification process would be completed shortly after closing, or as early as November 7, 2021.

148.    At or near the time of the November 15, 2021, closing, Eugene and the Company represented that that the Company was close to receiving UL approval on two EV charging machines and presented a "guaranteed" timeline for obtaining UL certification in a document titled, "UL Guaranteed Timeline.pdf."  This document shows steps that had purportedly already been completed and a timeline for obtaining final UL approval for both EV charging station machines in January 2022.

---

[5] The European equivalent of UL Certification ("CE" or "Conformite Europeenne") is not accepted in the U.S.  All of the EV charging station products with the "CE" mark required UL certification before being sold in the U.S.

149.    A true and correct copy of the UL Guaranteed Timeline provided by Eugene to UC in October 2021 is attached as Exhibit 15.

150.    Because Eugene and Vitaly insisted that funding the Transaction was necessary in order to obtain final UL approval of both machines and funding could not wait until after the UL certification had been obtained, two tranches for funding were established for the Transaction. Funding for the prosecution of the UL certification process for an EV charging station identified as "I-Station & DC Wall Complex" was made a condition to closing the Transaction

151.    Omar made an initial draw request under the Tranche 1 Budget on November 18, 2022, that was transmitted to UC via an email from Vitaly. The funding request referred to certain "most urgent AP items that need to go out ASAP and a couple of other immediate expenses in the next week." UC sent an initial payment of $32,200.00 to AE TIG upon closing. Months later, those "most urgent items" had not been paid, but payments to Drake Star and AE TIG's lawyers were apparently made.

152.    A true and correct copy of the November 18, 2021, email chain regarding the "urgent" funding request is attached as Exhibit 16.

153.    UC began providing the requested consulting services to AE TIG in November 2021.  UC and its personnel expended hundreds of hours and hundreds of thousands of dollars to prosecute the UL Case and to assist AE TIG to expand its operations and develop the infrastructure necessary for operations within the United States.

154.    Eugene and Omar misrepresented the UL certification requirements and status to UC.  The timeline for the UL certification process was misrepresented by Eugene, Omar, and AE TIG and the prospect of obtaining UL Certification was significantly delayed. As of January 22, 2022, the I-Station was only just coming out of the second of eleven phases of the UL

certification process and the certification of the DC Wall Station had not even started because the machines had not yet been sent to UL.  After closing Eugene and Omar tried to keep UC from discovering the current status and lack of progress for the UL certification, and refused to provide contact and other information for the UL certification process to UC.

155.    UC took over the UL certification process in January with assistance from Dmytro and Sergei (an engineer from AE Ukraine) and began working closely with the UL investigators to move the certification process forward.  At that time the UL certification was determined to be at least six months from completion.  Of the fourteen phases for the DC Wall Station, none had been completed as of January 6, 2022.  Of the eleven phases for the AC I-Station, only two were completed as of January 6, 2022.  In January 2022, Dmytro, Sergei (Ukraine engineer), Ben Moll and Chris Riley (both with UC) had to spend two weeks to prepare answers to all the outstanding questions and issues on the AC I-Station raised by UL.  Eugene and Omar had nothing to contribute to these discussions.

156.    In 2022, Eugene told UC that he was in the process of moving the manufacturing operations from Ukraine to the Czech Republic and UC should continue their investment into AE TIG because it is growing and thriving and they have "much more assets and technology and he has done nothing wrong."

157.    In fact, AE TIG had no charging station manufacturing capabilities to move out of Ukraine to Europe or the U.S.  AE TIG does not own the factory, nor does it have a role in the operations or management of the Ukrainian factory or any of Dmytro's Autoenterprise business in Ukraine or Europe.

158.    Any assets AE TIG claims to have would have been purchased with funds disbursed by UC as part of the approved budget for the Transaction, the only known source of revenue for AE TIG.

159.    The opportunity of selling EV charging stations to Drake Star clients and other prospective investors that could provide the monies to pay back UC for its advances and investments is slipping away while Eugene and his cohorts keep falsely claiming Eugene and/or AE TIG has some way to manufacture and sell EV charging stations.

**Breach of the Transaction Agreements**

160.    Bank statements for the AE TIG bank account showing how the $236,200 Tranche 1 disbursement was spent have been requested by UC numerous times in writing since December 17, 2021.  No bank information, statements, check registers or similar documents have been provided to UC.

161.    After Dmytro sent his December 11, 2021, email to Eugene stating that the deal that Dmytro understood would occur was in fact not the deal represented to UC and that he wanted answers (see Exhibit 6), Chris Riley traveled to Burbank, California to meet with Eugene on about December 14, 2021. The next day, Eugene left the U.S.  Eugene and Omar then visited new potential investors Kazakhstan.

162.    When UC informed Drake Star of misrepresentations by AE TIG and its principals and representatives, Vitaly sent an email to Eugene and Attorney Grayver asking for explanations for seven key issues and several specific questions:

- What is the exact arrangement between you and Dmytro? According to him, your arrangement is very different from the structure of the transaction you agreed to with United.
- The entities that were presented as subsidiaries are Auto Enterprise, LLC and EV Future. Those were represented in the org chart as AE Factory and EV

Future, LLC and as having the assets of the factory and the charging network. Is that accurate?

- Why weren't financial statements and/or tax returns provided for the entities that included the factory and charging network during due diligence?

- The financial statements that Dmytro provided are dramatically different than the historical revenue numbers you represented to Drake Star, and they are in different company names…can you explain?

- Omar told United that they couldn't pay directly for modems and to send the $96K directly to TIG account and that he would provide an invoice. The modems were not purchased, the $96K was kept, and United was not notified. If the money was used for other expenses, please provide an accounting of it to us and we'll provide it to United.

- Did you then ask United for another $45K in December when you had the $96K in your account?

- Please provide bank statements for the Auto Enterprise, TIG account through December 2021.

163.    To date, no response has been received and all questions have gone unanswered.

164.    A true and correct copy of Vitaly's January 11, 2022, email to Eugene and Attorney Grayver is attached as Exhibit 17.

165.    After funding the $1.0 million first tranche of the Transaction as set forth in the Side Letter Agreement and the Budget (Exhibits 9 and 11), but before funding the second tranche ($7.0 million), UC became increasingly frustrated that promised documents had never been provided, important questions remained unanswered, and progress on the UL certification was stymied.  When information from Dmytro emerged to show that Eugene and the other Defendants and those working with them had misrepresented many material aspects of the deal, including Company assets, revenues, and rights to the IP needed to develop an EV charging station business in the U.S., UC elected to exercise its rights under paragraph 3 of the Side Letter Agreement (Exhibit 9) to terminate the Transaction.

166.     UC's counsel sent a letter on January 28, 2022, to Attorney Grayver notifying the Defendants that UC was terminating the Transaction and demanding return of the funds advanced under the Tranche 1 Budget (the "Termination Letter").

167.     A true and correct copy of the January 28, 2022, Termination Letter (with portions of the letter related to settlement redacted) is attached as Exhibit 18.

168.     No amount under the Tranche 1 Budget or advanced to AE TIG has been returned to UC.

**COUNT I**
**VIOLATION OF FEDERAL SECURITIES LAWS AGAINST ALL DEFENDANTS**

169.     Plaintiff UC realleges and incorporates the allegations in paragraphs 1-168 above as if fully restated herein.

170.     Each, and all of the Defendants, individually and jointly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

171.     Each, and all of the Defendants, individually and jointly, have made untrue statements of material facts to the Plaintiff and/or omitted to state material facts necessary to make those statements they did make not misleading as shown above in paragraphs 1 through 168 above, and particularly in (but not limited to) paragraphs 63-69, 71-101, 113, 115-145, 147-158, 160-162 above.

172.      Each, and all of the Defendants, individually and jointly, have participated in a scheme to defraud the Plaintiff.

173.     Each, and all of the Defendants, individually and jointly, have engaged in acts and a course of business that has operated as a fraud on the Plaintiff in connection with its purchase of a security.

174.    Each of the individual Defendants, Eugene, Omar, and Attorney Grayver acted with scienter because each of them knew, should have known, or recklessly disregarded that their statements and omissions were materially false and misleading at the time they were made.

175.    The scienter of individual Defendants, Eugene, Omar, and Attorney Grayver is properly imputed to AE TIG.

176.    The scienter of individual Defendant Attorney Grayver is also properly imputed to the Grayver Law Group.

177.    By virtue of the role and position of Defendant Eugene as majority owner, CEO and the only director of AE TIG, AE TIG had actual knowledge that its representations and warranties to UC in the Side Letter Agreement (Exhibit 9) were materially false and misleading statements and were made with the intent to deceive UC.

178.    Defendants Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually and jointly, participated in and/or aided and abetted the misrepresentations made by or on behalf of AE TIG to UC that were materially false and misleading statements and were made with the intent to deceive UC.

179.    AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually and jointly, acted with reckless disregard for the truth and failed or refused to disclose facts that would have revealed the materially false and misleading nature of the statements made in the Side Letter Agreement and the other Transaction Documents and did so even though such facts were readily available to each and all of them.

180.    Any statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. None of the specific false statements, representations and warranties described herein above were

identified as forward-looking when made and/or they were each statements of past or present matters when made.

181.     The Defendants' wrongful conduct, individually and jointly, as alleged herein, directly and proximately caused the harm and economic loss suffered by Plaintiff UC.

182.     UC reasonably relied on the statements and representations of past and present facts as well as the omissions of material facts made by the Defendants, individually and collectively, including those described above, and particularly those described in (but not limited to) paragraphs 63-69, 71-101, 113, 115-145, 147-158, 160-162 above.

183.     As a direct and proximate result of Defendants' individual and joint wrongful conduct, UC was harmed and suffered damages in connection with its investment in the UC SAFE Agreement and its investment in the Transaction described above.

184.     UC has sustained other losses by incurring out of pocket costs, investing the time and efforts of its staff and executives in pursuing the UL certification and other activities induced by Defendants' individual and joint wrongful conduct.

185.     As a direct and proximate result of Defendants' individual and joint intentional, fraudulent, reckless, and wrongful conduct, UC is entitled to additional amounts for punitive or treble damages.

186.     As a result of Defendants' individual and joint unlawful and wrongful activity, Plaintiff UC is entitled to an award for its actual, consequential, and other damages in an amount to be proven at trial, plus punitive or treble damages, interest, costs, expenses, and reasonable attorneys' fees incurred in this action.

## COUNT II
## VIOLATION OF DELAWARE SECURITY LAWS AGAINST ALL DEFENDANTS

187.    Plaintiff UC realleges and incorporates the allegations in paragraphs 1 through

168, and 169-86 above as if fully restated herein.

188.    Each, and all of the Defendants, individually and jointly, violated Section 73-201

of the Delaware Securities Act, 6 Del. C. § 73-201.

189.    The Defendants' wrongful conduct, individually and jointly, as alleged herein,

directly and proximately caused the harm and economic loss suffered by Plaintiff UC.

190.    UC reasonably relied on the statements and representations of past and present

facts as well as the omissions of material facts made by the Defendants, individually and

collectively, including those described above, and particularly those described in paragraphs  63-

69, 71-101, 113, 115-145, 147-158, 160-162 above.

191.    As a direct and proximate result of Defendants' individual and joint wrongful

conduct, UC was harmed and suffered damages in connection with its investment in the UC

SAFE Agreement and its investment in the Transaction described above.

192.    UC has sustained other losses by incurring out of pocket costs, investing the time

and efforts of its staff and executives in pursuing the UL certification, and other activities

induced by Defendants' individual and joint wrongful conduct.

193.    As a direct and proximate result of Defendants' individual and joint intentional,

fraudulent, reckless, and wrongful conduct, UC is entitled to additional amounts for punitive or

treble damages.

194.    As a result of Defendants' individual and joint intentional, fraudulent, reckless,

and wrongful conduct, Plaintiff UC is entitled to an award for its actual, consequential, and other

damages in an amount to be proven at trial, plus punitive or treble damages, interest, costs, expenses, and reasonable attorneys' fees incurred in this action.

## COUNT III
## FRAUD/MISREPRESENTATION AGAINST ALL DEFENDANTS

195.     Plaintiff UC realleges and incorporates the allegations in paragraphs 1 through 168 above as if fully restated herein.

196.     As specified above in (but not limited to) paragraphs 63-69, 71-101, 113, 115-145, 147-158, 160-162,  Defendant AE TIG made false statements, representations and warranties to Plaintiff UC.

197.      Defendants Eugene, Omar, Attorney Grayver, and the Grayver Law Group, acting individually or jointly, facilitated and aided and abetted AE TIG's misrepresentations to UC by supplying false and misleading information to UC, or by omitting material facts in their communications to UC.

198.     The representations and warranties made in the Side Letter Agreement (Exhibit 9) at paragraph 2a, c-l are materially false and misleading.

199.     Each of the individual Defendants AE TIG, Eugene, Omar, and Attorney Grayver knew and should have known these representations and warranties were materially false and misleading when made.

200.      Each of the Defendants AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually or jointly, acted with reckless disregard for the truth or falsity of the representations and warranties in the Side Letter Agreement and in their communications with UC.

201.     Each of the Defendants AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group acted, individually or jointly, with the intent to deceive Plaintiff UC and

induce UC into believing and relying on the warranties and representations in the Side Letter Agreement.

202.    The Defendants' individual and joint misrepresentations were made intentionally and with the intent to induce, and did induce, the Plaintiff UC to invest in the Transaction.

203.     Each of the individual Defendants Eugene, Omar, and Attorney Grayver, knew or should have known that AE TIG's  representations and warranties were false and misleading.

204.    Each of the individual Defendants Eugene, Omar, and Attorney Grayver, knew or should have known that statements made to UC as detailed in paragraphs 63-69, 71-101, 113, 115-145, 147-158, 160-162 above were false and misleading.

205.    UC relied to its detriment on Defendants' individual and joint misrepresentations, false statements, representations, and warranties.

206.    UC's reliance on Defendants' individual and joint misrepresentations, false statements, representations, and warranties was reasonable and justifiable.

207.    Each, and all of the Defendants, individually and jointly, have engaged in acts and a course of business that has operated as a fraud on the Plaintiff.

208.    Each, and all of the Defendants, individually and jointly, have participated in a scheme to defraud the Plaintiff.

209.    Each of the individual Defendants, Eugene, Omar, and Attorney Grayver acted with scienter because each of them knew or recklessly disregarded that their statements and omissions were materially false and misleading at the time they were made.

210.    The scienter of individual Defendants, Eugene, Omar, and Attorney Grayver is properly imputed to AE TIG.

211.    The scienter of individual Defendant Attorney Grayver is also properly imputed to the Grayver Law Group.

212.    AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group acted individually and jointly with reckless disregard for the truth and failed or refused to disclose facts that would have revealed the materially false and misleading nature of the statements made in the Side Letter Agreement and the other Transaction Documents and even though such facts were readily available to each and all of them.

213.    The Defendants' wrongful conduct, individually and jointly, as alleged herein, directly and proximately caused harm and the economic loss suffered by Plaintiff UC.

214.    As a direct and proximate result of Defendants' individual and joint, intentional, fraudulent, reckless, and wrongful conduct, UC is entitled to additional amounts for punitive or treble damages, interest, costs, reasonable attorneys' fees, and expenses incurred in this action.

215.    UC has sustained other losses equal to hundreds of thousands of dollars by incurring out of pocket costs, investing the time and efforts of its staff and executives in pursuing the Transaction, the UL certification, and other activities, as well as by incurring attorneys' fees.

216.    UC has been damaged because it has not received the value of its investment in the Transaction as promised and has lost the opportunities promised to it in connection with the Transaction, resulting in lost profits for UC

217.    Defendants' misrepresentations are the proximate cause of Plaintiff UC's loss, and UC would not have sustained these losses but for Defendants' individual and joint fraud and wrongful conduct.

218.    In fraudulently misrepresenting the nature and financial basis for the Transaction, and making false representations and warranties in the Side Letter Agreement, Defendants, acted

individually and collectively, intentionally, willfully, and maliciously with a desire to enrich themselves and with a conscious disregard of how their conduct affected UC, all in a manner that warrants an award of punitive damages.

219.    As a result of Defendants' individual and joint intentional, fraudulent, reckless, and wrongful conduct, Plaintiff UC is entitled to an award for its actual, consequential, and other damages in an amount to be proven at trial, plus punitive or treble damages, interest, costs, expenses, and reasonable attorneys' fees incurred in this action.

## COUNT IV
## BREACH OF CONTRACT AGAINST AE TIG

220.    Plaintiff UC realleges and incorporates the allegations in paragraphs 1 through 168 above as if fully restated herein.

221.    Plaintiff UC and Defendant AE TIG entered into a valid, enforceable, and binding agreement on November 15, 2021. (See the Transaction Documents described above and identified as Exhibits 2, 3, 7, 8, 9, 10, and 11.)

222.    Plaintiff UC gave consideration for this agreement, and has fully performed any of its obligations under the agreement that are due and owing.

223.    All conditions precedent to Defendant AE TIG's obligation to perform under the agreement have been satisfied.

224.    Defendant AE TIG has breached its agreement with UC.

225.    Through counsel, UC advised AE TIG that it was in breach of the parties' agreement, and demanded return of its investment as provided for in paragraph 3 of the Side Letter Agreement (Exhibit 9) (see paragraphs 165-168 above).

226.    AE TIG has not complied with paragraph 3 of the Side Letter Agreement (Exhibit 9) and the investment amount has not been returned to UC.

227.     As a further result of Defendant AE TIG's breaches, Plaintiff UC incurred consequential and other damages including the time and expenses its personnel devoted to the Transaction and pursuing UL certification for the EV charging stations, as well as lost profits from the anticipated sale of the EV charging stations in the U.S., all in an amount to be determined at trial.

228.     The consequential and other damages described herein were foreseeable and within the contemplation of the parties before or at the time the agreement was made.

229.     Plaintiff's damages flow directly from and are the natural and probable consequences of Defendant AE TIG's breaches.

230.     As a result of Defendant AE TIG's breaches, Plaintiff UC has been damaged in an amount to be proven at trial, but equal to at least the amount of its investment, its consequential and other damages.

231.     In breaching the agreement, AE's conduct was intentional, willful, tortious, fraudulent, reckless, and deceitful such that Plaintiff UC is entitled to an award of punitive or treble damages.

232.     Plaintiff is entitled to recover its actual, consequential and other damages as a result of AE's breaches, in an amount to be proven at trial and sufficient to make UC whole, as well as additional amounts for punitive or treble damages, interest, costs, and reasonable attorneys' fees incurred in this action.

### Count V
### Tortious Interference with a Contract Against Eugene, Omar, Attorney Grayver and the Grayver Law Group

233.     Plaintiff UC realleges and incorporates the allegations in paragraphs 1 through 168 above as if fully restated herein.

234.     As described herein above and in Count IV above (paragraphs 220-232 above), Plaintiff UC and Defendant AE TIG entered into a valid, enforceable, and binding agreement on November 15, 2021.

235.     At all relevant times, Eugene, Omar, Attorney Grayver, and the Grayver Law Group were aware of the existence and terms of the Agreement.

236.     Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually and jointly, intentionally and improperly facilitated AE TIG's breach of its agreement with UC, and did so by supplying false and misleading information to Plaintiff UC, omitting material information that rendered other statements made to UC false and misleading, and by other unlawful means.

237.     Attorney Grayver and the Grayver Law Group intentionally and improperly facilitated AE TIG's breach of the agreement, and did so by supplying false and misleading information to Plaintiff UC about the EV charging station leases in the Ukraine, among other things.

238.     The breach of the agreement between AE TIG and UC would not have occurred but for the activities of Eugene, Omar, Attorney Grayver, and the Grayver Law Group, including by supplying false and misleading information to Plaintiff UC.

239.     As a result of the individual and joint conduct of Eugene, Omar, Attorney Grayver, and the Grayver Law Group, Plaintiff UC has incurred damages in an amount to be determined at trial.

240.     UC's damages flow directly from and are the natural and probable consequence of the individual and joint conduct of Eugene, Omar, Attorney Grayver, and the Grayver Law

Group, including their misrepresentations and omissions that led to AE TIG's breach of the agreement.

241.     As a result of the individual and joint conduct Eugene, Omar, Attorney Grayver, and the Grayver Law Group and their interference with the AE TIG agreement with UC as set forth herein above, Plaintiff UC has sustained actual, consequential and other damages in an amount to be determined at trial.

242.     The individual and joint conduct of Eugene, Omar, Attorney Grayver, and the Grayver Law Group was without justification and improper.

243.     The consequential and other damages described above were foreseeable and within the contemplation of the parties before or at the time the agreement between AE TIG and UC was made.

244.     Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually and jointly, acted fraudulently, willfully, and with such a high degree of moral culpability as to warrant punitive or treble damages.

245.     Plaintiff UC is entitled to punitive or treble damages against Eugene, Omar, Attorney Grayver, and the Grayver Law Group, individually and jointly, in an amount to be determined at a trial of this action.

246.     Plaintiff is entitled to recover from Eugene, Omar, Attorney Grayver, and the Grayver Law Group, jointly and severally, its actual, consequential and other damages, as well as punitive or treble damages, and additional amounts for interest, costs, and reasonable attorneys' fees incurred in this action.

## COUNT VI
## UNJUST ENRICHMENT AGAINST EUGENE AND OMAR

247.    Plaintiff UC realleges and incorporates the allegations in paragraphs 1 through 168 above as if fully restated herein.

248.    Defendants, Eugene and Omar, each of them individually and jointly, received a benefit as a result of monies paid to AE TIG under fraudulent or false pretenses.

249.    Defendants Eugene and Omar, individually and jointly, participated in conduct (as described above) that induced UC to pay money to AE TIG under false pretenses.

250.    Defendants Eugene and Omar, individually and jointly, participated in conduct (as described above) that caused monies paid by UC to AE TIG not to be used by AE TIG for the purposes for which it intended, but instead to be diverted and paid, in part, to each of them or for their benefit.

251.    Defendants Eugene and Omar, individually and jointly, received monies intended to be used to further the Transaction described above and diverted such money for their individual gain and benefit under circumstances that would make it unjust for either or both of them to retain the benefit they received without commensurate compensation to the Plaintiff.

252.    Eugene and Omar, individually and jointly, acted fraudulently, willfully, recklessly, and with such a high degree of moral culpability as to warrant an award of punitive or treble damages against them and for the Plaintiff

253.    Plaintiff is entitled to recover from Eugene and Omar, jointly and severally, in an amount to be determined at trial, its actual, consequential and other damages, as well as punitive or treble damages, and additional amounts for interest, costs, and reasonable attorneys' fees in this action.

**WHEREFORE,** as to Counts I, II, and III, Plaintiff UC respectfully requests that the Court (i) enter judgment in its favor and against each and all of the Defendants AE TIG, Eugene, Omar, Attorney Grayver, and the Grayver Law Group, jointly and severally, for the losses and actual consequential, and other damages incurred by the Plaintiff, in an amount to be determined at trial, but not less than $1.0 million, plus additional amounts for punitive or treble damages, interest, costs, reasonable attorneys' fees and expenses incurred in this action; (ii) declare that none of the Defendants has any rights to the intellectual property related to the EV charging stations that was the subject of the Transaction or is otherwise owned or controlled by Dmytro, Autoenterprise PC and/or his or its subsidiaries, assignees, or licensees; and (iii) grant UC such other and further relief as the Court deems just and proper.

As to Count IV, Plaintiff UC requests that the Court (i) enter judgment in its favor and against Defendant AE TIG for breach of the Parties' agreement for the losses and actual consequential, and other damages incurred by the Plaintiff, in an amount to be determined at trial, but it less than $1.0 million, plus punitive or treble damages, interest, costs, reasonable attorneys' fees, and expenses incurred by UC in this action; (ii) declare AE TIG has no rights to the intellectual property related to the EV charging stations that was the subject of the Transaction or otherwise owned or controlled by Dmytro, Autoenterprise PC and/or his or its subsidiaries, assignees or licensees; and (iii) grant UC such other and further relief as the Court deems just and proper.

As to Count V, Plaintiff UC requests that the Court (i) enter judgment in its favor and against Defendants Eugene, Omar, Attorney Grayver, and the Grayver Law Group, jointly and severally, for tortious interference with the parties' agreement for the Transaction describe above for the losses and actual consequential, and other damages incurred by the Plaintiff, in an amount

to be determined at trial, but not less than $1.0 million, plus punitive or treble damages, interest, costs, reasonable attorneys' fees, and expenses incurred by UC in this action, and (ii) grant UC such other and further relief as the Court deems just and proper.

As to Count VI, Plaintiff UC requests that the Court (i) enter judgment in its favor and against Defendants Eugene and Omar jointly and severally, for unjust enrichment for the losses and actual consequential, and other damages incurred by the Plaintiff, in an amount to be determined at trial, but not less than $1.0 million, plus punitive or treble damages, interest, costs, reasonable attorneys' fees, and expenses incurred by UC in this action, and (ii) grant UC such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff United Cutwater, LLC hereby demands trial by jury on all issues so triable against Defendants Auto Enterprise TIG Inc., Yevgen Arutyunyan, Omar Zhandarbekuly, Leonard Grayver, and the Grayver Law Group, P.C.

Respectfully submitted,

*/s/ Judy L. Woods*
Judy L. Woods
Alexandra E. Wilson
KRIEG DEVAULT, LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
Telephone:  (317) 636-4341
Facsimile:  (317) 636-1507
E-Mail: jwoods@kdlegal.com
            awilson@kdlegal.com
