# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED CUTWATER, LLC , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUTO ENTERPRISE TIG INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| _ | ) | Case No.: 3:22-cv-00056-RLY-CSW |
| AUTO ENTERPRISE TIG INC., and | ) | |
| YEVGEN ARUTYUNYAN, | ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED CUTWATER, LLC , and | ) | |
| UNITED LEASING, INC., | ) | |
| | ) | |
| Counter Defendants. | | |

## AUTO ENTERPRISE TIG'S ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant Auto Enterprise TIG ("AE" or "Defendant"), files this Answer to Plaintiff

United Cutwater, LLC ("Plaintiff" or "UC")'s Second Amended Complaint ("SAC"), and

Affirmative Defenses as follows:

## **GENERAL DENIAL**

Pursuant to the provisions of Rule 8 of the Federal Rules of Civil Procedure, Defendant generally and specifically denies each and every allegation set forth in the Second Amended Complaint, and each and every purported cause of action contained therein, and further denies, generally and specifically, that Plaintiff is entitled to any relief against Defendant.

### **THE PARTIES AND THEIR REPRESENTATIVES**

1.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the SAC, and on this basis, denies them.

2.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2  of the SAC, and on this basis, denies them.

3.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the SAC, and on this basis, denies them.

4.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the SAC, and on this basis, denies them.

5.      Defendants admit that AE is a Delaware corporation and was formed in 2021, with its principal place of business in Burbank, California.  Defendants admit that AE does business in the United States, Ukraine and Europe.  To the extent the allegations in paragraph 5 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

6.      Defendant admits that Eugene is the Chief Executive Officer and Secretary of AE. Defendant otherwise denies knowledge or information sufficient to form a belief as the truth to the allegations in paragraph 6, and on this basis, denies them.

7.      Defendant admits the allegations in paragraph 7 of the SAC.

1

8.     Defendant admits that he told Plaintiff he was CEO of AE TIG. Defendant otherwise denies knowledge or information sufficient to form a belief as the truth to the allegations in paragraph 8, and on this basis, denies them.

9.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the SAC, and on this basis, denies them.

10.     Defendant admits that AE was represented in transactions by Leonard Gravyer and his law firm, Gravyer Law Group.  Defendant otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10, and on this basis, denies them.

## JURISDICTION AND VENUE

11.     The jurisdictional allegations contained in paragraph 11 state legal conclusions as to which no answer is required.  To the extent an answer is required, Defendant admits that this Court has personal jurisdiction over this matter.

12.     The jurisdictional allegations contained in paragraph 12 state legal conclusions to which no answer is required.  To the extent an answer is required, Defendant admits that this Court has subject matter jurisdiction over this matter.

13.     The jurisdictional allegations contained in paragraph 13 state legal conclusions to which no answer is required.  To the extent an answer is required, Defendant admits that this Court has subject matter jurisdiction over this matter.

14.     The jurisdictional allegations contained in paragraph 14 state legal conclusions to which no answer is required.  To the extent an answer is required, Defendant admits that venue is proper in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

### Background to the Transaction

15.     Defendant admits that it was formed as an EV charging station business. Defendant otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15, and on this basis, denies them.

16.     Defendant denies the allegations in paragraph 16.

17.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17, and on this basis, denies them.

18.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18, and on this basis, denies them.

19.     Defendant denies the allegations in paragraph 19.

20.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, and on this basis, denies them.

21.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21, and on this basis, denies them.

22.     To the extent the allegations in paragraph 22 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.  Defendant otherwise denies the allegations in paragraph 22.

23.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, and on this basis, denies them.

24.     Defendant denies the allegations in paragraph 24.

**United Cutwater and AE TIG Execute the Transaction Documents**

25.     Defendant admits that it entered into a SAFE Agreement dated November 15, 2021, with Plaintiff.  Defendant otherwise denies having knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 25 and Footnote 2, and on this basis, denies them.[1]

26.    Defendant admits that it participated in negotiations with Plaintiff during 2021. Defendant otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26, and on this basis, denies them.

27.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27, and on this basis, denies them.

28.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28, and on this basis, denies them.

29.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29, and on this basis, denies them.

30.    Defendant admits that it executed a Letter Agreement Re: Restructuring Obligations dated September 25, 2021.  Defendant admits that it executed the AE TIG SAFE Term Sheet dated October 20, 2021.  Defendant admits that it executed a SAFE Agreement with Plaintiff dated November 15, 2021.  Defendant admits that it entered into a Side Letter Agreement dated November 15, 2021, which contained a Tranche 1 Budget as an exhibit.  To the extent the allegations in paragraph 30 purport to characterize or paraphrase the contents of a written document(s), the document(s) speak(s) for itself, and Defendant denies the allegations to the extent they are inconsistent with the document(s).

31.    To the extent the allegations in paragraph 31 purport to characterize or paraphrase the contents of a written document(s), the document(s) speak(s) for itself, and Defendant denies the allegations to the extent they are inconsistent with the document(s).  Defendant otherwise

---

[1] To the extent the allegations in Footnote 2 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations.

denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31, and on this basis, denies them.

32.     Defendant denies the allegations in paragraph 32.

33.     To the extent the allegations in paragraph 33 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.  Defendant otherwise denies the allegations in paragraph 33.

34.     Defendant admits it executed the Restructuring Agreement. To the extent the allegations in paragraph 34 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.  Defendant otherwise denies the allegations in paragraph 34.

35.     Defendant admits it executed a term sheet for the Simple Agreement for Future Equity dated October 20, 2021.  To the extent the allegations in paragraph 35 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

36.     To the extent the allegations in paragraph 36 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

37.     To the extent the allegations in paragraph 37 purport to characterize or paraphrase the contents of one or more written documents, the documents speaks for themselves, and Defendant denies the allegations to the extent they are inconsistent with the documents. Defendant otherwise denies the allegations in paragraph 37.

38.    Defendant admits that it entered into the SAFE Agreement dated November 15, 2021.  To the extent the allegations in paragraph 38 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document. Defendant otherwise denies the allegations in paragraph 38.

39.    To the extent the allegations in paragraph 39 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

40.    Defendant denies the allegations in paragraph 40 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

41.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41, and on this basis, denies them.

42.    To the extent the allegations in paragraph 42 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.  Defendant otherwise denies the allegations in paragraph 42.

43.    Defendant admits that it entered into a Side Letter Agreement dated November 15, 2021, with Plaintiff.  To the extent the allegations in paragraph 43 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

44.    To the extent the allegations in paragraph 44 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

45.     Defendant denies the allegations in paragraph 45.

46.     Defendant denies the allegations in paragraph 46 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

47.     To the extent the allegations in paragraph 47 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

48.     Defendant admits that it entered into a Tranche I Budget for the Expansion Project.  To the extent the allegations in paragraph 48 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

49.     To the extent the allegations in paragraph 49 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

50.     Defendant denies the allegations in paragraph 50.

51.     Defendant denies the allegations in paragraph 51.

52.     To the extent the allegations in paragraph 52 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

53.     Defendant admits that the parties never entered into a consulting agreement. Defendant otherwise denies the allegations in paragraph 53.

54.     Defendant denies the allegations in paragraph 54 to the extent they purport to characterize or paraphrase the contents of written documents, as the documents speak for themselves.

55.    Defendant denies the allegations in paragraph 55 to the extent they purport to characterize or paraphrase the contents of written documents, as the documents speak for themselves.

56.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56, and on this basis, denies them.

57.    Defendant denies the allegations in paragraph 57 to the extent they purport to characterize or paraphrase the contents of written document, as the documents speaks for themselves.

58.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58, and on this basis, denies them.

59.    Defendant admits the allegations in paragraph 59.

60.    Defendant admits that the Parties conducted a Zoom call on November 20, 2021 and discussed multiple topics. Defendant otherwise denies the allegations in paragraph 60.

**Representations and Warranties in the Side Letter Agreement**

61.    Defendant denies the allegations in paragraph 61 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

62.    Defendant denies the allegations in paragraph 62 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 62.

63.    Defendant denies the allegations in paragraph 63 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

64.    Defendant denies the allegations in paragraph 64 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

65.     Defendant admits the allegations in paragraph 65.

**Misrepresentations About Legal and Tax Issues for AE LLC/UK**

66.     Defendant denies the allegations in paragraph 66.

67.     Defendant denies the allegations in paragraph 67 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

68.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68, and on this basis, denies them.

69.     Defendant denies the allegations in paragraph 69 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 69.

70.     Defendant denies the allegations in paragraph 70 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

71.     Defendant denies the allegations in paragraph 71 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

72.     Defendant denies the allegations in paragraph 72 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

73.     Defendant denies the allegations in paragraph 73 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

74.     Defendant denies the allegations in paragraph 74 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

75.     Defendant denies the allegations in paragraph 75.

76.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76, and on this basis, denies them.

77.    Defendant denies the allegations in paragraph 77.

**Misrepresentations About AE TIG's Ability to Engage in the EV Charging Business**

78.    Defendant denies the allegations in paragraph 78 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 78.

79.    Defendant denies the allegations in paragraph 79 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 79.

80.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in pDefaragraph 80 relating to the status of the EV charging stations or charger components made in the Ukraine.  Defendant otherwise denies the allegations in paragraph 80.

81.    Defendant denies the allegations in paragraph 81.

82.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82, and on this basis, denies them.

83.    Defendant denies the allegations in paragraph 83 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 83.

84.    Defendant denies the allegations in paragraph 84 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself. Defendant otherwise denies the allegations in paragraph 84.

85.    Defendant admits that Eugene sent Exhibit 8 to Dmytro.

86.    Defendant denies the allegations in paragraph 86.

87.     Defendant denies the allegations in paragraph 87.

88.     Defendant denies the allegations in paragraph 88.

89.     Defendant denies the allegations in paragraph 89.

**Obligations and Performance Under the Consulting Agreement**

90.     Defendant denies the allegations in paragraph 90.

91.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 5.

92.     Defendant denies the allegations in paragraph 92.

93.     Defendant denies the allegations in paragraph 93.

94.     Defendant admits that UL certification is integral to the sale or lease of EV charging stations in the United States. Defendant otherwise denies the allegations in paragraph 94.

95.     Defendant denies the allegations in paragraph 95.

96.     Defendant denies the allegations in paragraph 96.

97.     Defendant denies the allegations in paragraph 97.

98.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98, and on this basis, denies them.

99.     Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99, and on this basis, denies them.

100.    Defendant denies the existence of a consulting agreement between the parties. Defendant otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100, and on this basis, denies them.

101.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101, and on this basis, denies them.

102.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102, and on this basis, denies them.

103.    Defendant denies the allegations in paragraph 103.

104.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104, and on this basis, denies them.

105.    Defendant denies the allegations in paragraph 104.

106.    Defendant denies the allegations in paragraph 105.

107.    Defendant denies the allegations in paragraph 106.

108.    To the extent the allegations in paragraph 108 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

109.    Defendant denies the allegations in paragraph 109.

110.    Defendant denies the allegations in paragraph 110.

**Misrepresentations by Eugene and Omar**

111.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111, and on this basis, denies them.

112.    To the extent the allegations in paragraph 112 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.    Defendant otherwise denies the allegations in paragraph 112.

113.    To the extent the allegations in paragraph 113 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

114.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114, and on this basis, denies them.

115.    Defendant denies the allegations in paragraph 115.

116.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116, and on this basis, denies them.

117.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117, and on this basis, denies them.

118.    Defendant admits that it requested $96,000 for 5G modems. Defendant otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118, and on this basis, denies them.

119.    Defendant admits that Plaintiff made a payment in the amount of $32,200. Defendant otherwise denies the allegations in paragraph 119.

120.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120, and on this basis, denies them.

121.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121, and on this basis, denies them.

122.    Defendant denies the allegations in paragraph 122.

123.    Defendant denies the allegations in paragraph 123.

**The Termination of the Parties' Relationship**

124.    Defendant denies having knowledge or information sufficient to form a belief as to the allegations in paragraph 124, and on this basis, denies them.

125.    Defendant admits that it attended a meeting in Evansville, Indiana, between December 6 and December 8, 2021. Defendant otherwise denies the allegations in paragraph 125.

126.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126, and on this basis, denies them.

127.    To the extent the allegations in paragraph 127 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.  Defendant otherwise denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127, and on this basis, denies them.

128.    Defendant denies the allegations in paragraph 128 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

129.    To the extent the allegations in paragraph 129 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

130.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130, and on this basis, denies them.

131.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131, and on this basis, denies them.

132.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132, and on this basis, denies them.

133.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133, and on this basis, denies them.

134.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134, and on this basis, denies them.

135.    Defendant admits that Plaintiff wired $45,000 in December, 2021.  Defendant otherwise denies the allegations in paragraph 135, and on this basis, denies them.

136.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136, and on this basis, denies them.

137.    To the extent the allegations in paragraph 137 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

138.    Defendant denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138, and on this basis, denies them.

139.    To the extent the allegations in paragraph 139 purport to characterize or paraphrase the contents of a written document, the document speaks for itself, and Defendant denies the allegations to the extent they are inconsistent with the document.

### DAMAGES

140.    Defendant denies the allegations in paragraph 140.

141.    Defendant denies the allegations in paragraph 141.

142.    Defendant denies the allegations in paragraph 142.

143.    Defendant denies the allegations in paragraph 143.

### CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT AGAINST AE TIG

144.    No response is required to the allegations in paragraph 144.

145.    No response is required to the allegations in paragraph 145.

146.    Defendant admits that the parties entered into the SAFE Agreement on or about November 15, 2021. Defendant otherwise denies the allegations in paragraph 146.

147.    Defendant denies the allegations in paragraph 147.

148.    Defendant denies the allegations in paragraph 148 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

149.    Defendant denies the allegations in paragraph 149 to the extent they purport to characterize or paraphrase the contents of written documents, as the documents speak for themselves. Defendant otherwise denies the allegations in paragraph 149.

150.    Defendant denies the allegations in paragraph 150 to the extent they purport to characterize or paraphrase the contents of written documents, as the documents speak for themselves. Defendant otherwise denies the allegations in paragraph 150.

151.    Defendant denies the allegations in paragraph 151 to the extent they purport to characterize or paraphrase the contents of various written documents, as the documents speak for themselves. Defendant otherwise denies the allegations in paragraph 151.

152.    Defendant denies the allegations in paragraph 152 to the extent they purport to characterize or paraphrase the contents of various written documents, as the documents speak for themselves. Defendant otherwise denies the allegations in paragraph 152.

153.    Defendant denies the allegations in paragraph 153.

154.    Defendant denies the allegations in paragraph 154.

155.    Defendant denies the allegations in paragraph 155.

156.    Defendant denies the allegations in paragraph 156 to the extent they purport to characterize or paraphrase the contents of a written document, as the document speaks for itself.

157.    Defendant denies the allegations in paragraph 157.

158.    Defendant denies the allegations in paragraph 158.

159.    Defendant denies the allegations in paragraph 159.

160.    Defendant denies the allegations in paragraph 160.

161.    Defendant denies the allegations in paragraph 161.

162.    Defendant denies the allegations in paragraph 162.

163.    Defendant denies the allegations in paragraph 163.

164.    Defendant denies the allegations in paragraph 164.

165.    Defendant denies the allegations in paragraph 165.

166.    Defendant denies the allegations in paragraph 166.

167.    Defendant denies the allegations in paragraph 167.

168.    Defendant denies the allegations in paragraph 168.

169.    Defendant denies the allegations in paragraph 169.

170.    Defendant denies the allegations in paragraph 170.[2]

## AFFIRMATIVE DEFENSES

Defendant alleges each of the following affirmative defenses to each and every cause of action asserted against it and to each of the acts and/or omissions with which Defendant is charged in the SAC.  Defendant hereby alleges the following affirmative defenses without assuming the burden of proof for such where the burden of defense is not by law upon Defendant.

---

[2] Because the Court has dismissed Counts II and III, Defendant will not respond to the allegations in those Counts.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Cause of Action)

1. The SAC fails to state facts sufficient to constitute a cause of action against Defendant.

## SECOND AFFIRMATIVE DEFENSE

### (Estoppel)

2. Defendant is informed and beliefs, and thereon alleges, that the SAC, and that each and every purported cause of action set forth therein, are barred by the doctrine of estoppel.

## THIRD AFFIRMATIVE DEFENSE

### (Res Judicata)

3. Defendant is informed and believes, and thereon alleges, that the SEC, and that each and every cause of action set forth therein, are barred by the doctrine of res judicata.

## FOURTH AFFIRMATIVE DEFENSE

### (Waiver)

4. Defendant is informed and believes, and thereon alleges, that the SAC, and that each and every purported cause of action set forth therein, are barred by the doctrine of waiver.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

5. Defendant is informed and believes, and thereon alleges, that the SAC, and that each and every purported cause of action set forth therein, are barred by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

6.     Defendant is informed and believes, and thereon alleges, that by virtue of the unlawful, careless, negligent, fraudulent, misrepresentative and/or wrongful conduct of Plaintiff, Plaintiff is barred from recovering against Defendant by the equitable doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

7.     The SAC and the claims therein are barred or limited, in whole or in part, because Plaintiff has not suffered any damages, and/or its losses, if any, are uncertain or speculative so as to bar any recovery.

## EIGHTH AFFIRMATIVE DEFENSE

### (Uncertainty)

8.     Plaintiff's SAC, and each and every purported cause of action set forth therein, are barred because the claims purportedly asserted therein are uncertain.

## NINTH AFFIRMATIVE DEFENSE

### (Mitigation of Damages)

9.     Plaintiff's SAC, and each and every purported cause of action set forth therein, are barred or reduced by Plaintiff's failure to take any and all reasonable and necessary actions to avoid or reduce damages, and any alleged damages must be reduced accordingly.

## TENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

10.     Defendant alleges that Plaintiff would be unjustly enriched by recovering damages in this matter.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

11.     Plaintiff's SAC is barred, in whole or in part, by the Statute of Frauds, to the extent that Plaintiff seeks to enforce any agreement with Plaintiff other than that which is set forth in writing.

## TWELFTH AFFIRMATIVE DEFENSE

### (Failure to Perform)

12.     The SAC and the claims therein are barred or limited, in whole or in part, by Plaintiff's failure to perform and its breach of any operative contractual agreement between the parties.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Excuse of Performance)

13.     The SAC and all the claims therein are barred or limited, in whole or in part, because Defendant was excused due to the conduct of Plaintiff or otherwise, from performing any obligation Defendant allegedly had under any contractual agreement between the parties.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Failure to Satisfy Condition Precedent)

14.     The SAC and all the claims therein are barred or limited, in whole or in part, by Plaintiff's failure to meet all conditions precedent and/or other contractual obligations in any contractual agreement with Defendant.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Termination of Contract)

15.     The SAC and all the claims therein are barred or limited, in whole or in part, because the parties terminated any operative contractual agreement, so that Defendant had no further obligation to Plaintiff.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Performance Complete)

16.     The SAC and all the claims therein are barred or limited, in whole or in part, because Defendant fulfilled all obligations it allegedly had under any operative contractual agreement between the parties.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Fraud/Mistake)

17.     The SAC and the claims therein are barred or limited, in whole or in part, because any operative contractual agreement between the parties was procured by fraud and/or mistake, and/or there was no meeting of the minds between the parties.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (No Future Obligation)

18.     The SAC and the claims therein are barred or limited, in whole or in part, because Defendant did not and could not repudiate any future obligation allegedly owed to Plaintiff, because no future obligation existed.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Covenant of Good Faith and Fair Dealing)

19.     The SAC and the claims therein are barred or limited, in whole or in part, by Plaintiff's failure to meet all contractual obligations under any operative contractual agreement, including but not limited to the implied covenant of good faith and fair dealing.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Offset)

20.     The SAC and the claims therein are barred or limited, in whole or in part, because the alleged damages or claims against Defendant are barred, reduced, or offset by Plaintiff's breach of any operative contractual agreement, lack of completion of performance, and/or other conduct and the resulting damages it owes to Defendant.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Causation)

21.     The SAC and the claims therein are barred or limited, in whole or in part, because Plaintiff's alleged damages, if any, were caused in whole or in part by its own conduct or by the conduct of its agents, and/or by the conduct of third parties, and not because of any conduct or actions by Defendant.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Quantum Meruit)

22.     The SAC and the claims therein are barred or limited, in whole or in part, by the doctrine of quantum meruit, insofar as Plaintiff failed to fulfill its obligations under any operative contractual agreement and has already been paid more than the value to which it was owed, if any.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

### (No Further Payment)

23.     The SAC and the claims therein are barred or limited, in whole or in part, because Plaintiff has received the reasonable value of its labor, services or materials, and it is not entitled to further payment.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (No Damages)

24.     The SAC and the claims therein are barred or limited, in whole or in part, because Defendant denies Plaintiff has been damaged in any sum, or at all, and denies Plaintiff is entitled to any damages under the SAC and each claim against Defendant therein.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Good Faith)

25.     The SAC and the claims therein are barred or limited, in whole or in part, because Defendant acted in good faith, complied in good faith with all relevant statutes and did not violate any relevant public policy.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Ratification)

26.     The SAC and the claims therein are barred or limited, in whole or in part, by virtue of Plaintiff having ratified any of the acts or conduct complained of.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Accord and Satisfaction)

27.     The SAC and the claims therein are barred or limited, in whole or in part, under the doctrine of accord and satisfaction, such that any existing obligation under any operative contractual agreement between the parties was discharged by the parties.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Consent)

28.     The SAC and the claims therein are barred or limited, in whole or in part, because Plaintiff consented to and/or approved of any of the alleged conduct and/or acts of Defendant.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Right to Raise Additional Defenses)

29.     Defendant alleges that Plaintiff failed to describe the causes of action with sufficient particularity so as to enable Defendant to determine all of its legal, contractual, and equitable rights.   As such, Defendant reserves the right to amend and/or supplement the averments of its Answer and Affirmative Defenses, and raise and assert all pertinent defenses ascertained through investigation and after discovery has begun and additional facts and information become available.

## **COUNTERCLAIMS**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant and Counterclaimant Auto Enterprise TIG ("AE"), along with Defendant and Counterclaimant Yevgen Arutyunyan ("Eugene" and collectively, with AE, "Counterclaimants") alleges as follows against Plaintiff and Counter-Defendant United Cutwater, LLC ("UC") and Counter-Defendant United Leasing, Inc. ("United Leasing" and, collectively with UC, "Counter-Defendants"):

## **JURISDICTION AND VENUE**

1.     This Court has personal jurisdiction over Counter-Defendants because, upon information and belief, they are both residents of Indiana and have a principal place of business in Evansville, Indiana.

2.     This Court has subject matter jurisdiction over this matter because this is a civil action between citizens of different states involving an amount in controversy over $75,000, excluding attorneys' fees and interest.

3.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

## **THE PARTIES**

4.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2).

24

5.      Counterclaimant Auto Enterprise TIG (AE) is a corporation formed under the laws of Delaware with its principal place of business in Burbank, California.

6.      Counterclaimant Yevgen Arutyunyan ("Eugene") is an individual residing in Burbank, California. Eugene is the Chief Executive Officer and Secretary of AE.

7.      Upon information and belief, Counter-Defendant United Cutwater, LLC is a limited liability company formed under the laws of Indiana, with a principal place of business in Evansville, Indiana.

8.      Upon information and belief, Counter-Defendant United Leasing, Inc., is an Indiana corporation with a principal place of business in Evansville, Indiana.

## GENERAL ALLEGATIONS

### A. AE and Eugene Expended Significant Time and Resources to Develop Their EV Charging Station Business With Dmytro Nikonov

9.      In or around 2020, Eugene moved to the United States to develop an electric vehicle ("EV") charging station business based on knowledge and ideas he developed in Ukraine (the "Project").

10.     To develop and operate his business, Eugene formed AE, a corporation formed under the laws of Delaware.

11.     Around this time, in or about August 2020, Eugene met Dmytro Nikonov ("Nikonov"), and they agreed to work together to develop an EV charging station business.

12.     Nikonov agreed to contribute to AE and Eugene various assets and intellectual property Nikonov owned relating to EV charging stations as well as his expertise. Nikonov affirmatively represented and assured AE and Eugene that he would transfer all the necessary assets and intellectual property for AE and Eugene to be able to develop an EV charging station business in the United States.

13.     Consistent with Nikonov's representations, on or about March 10, 2021, AE and Nikonov entered into an Assignment of IP and Other Assets agreement (the "Assignment Agreement").  Under the terms of the Assignment Agreement, Nikonov agreed to sell, transfer, assign and convey assets, technology and intellectual property to AE.

14.     To further move forward on the Project, on March 10, 2021, Nikonov and AE also executed a Confidentiality and Intellectual Property Assignment Agreement, whereby Nikonov agreed to maintain the confidentiality of AE's business, technology, business relationships and/or financial affairs that AE had not previously released to the general public.

15.     In or around October 2021, AE acquired 100% of the equity and ownership in two companies owned by Nikonov, AE LLC/UK and EV Future.

16.     At all relevant times, Nikonov represented to AE and Eugene that the acquisition of AE LLC/UK and EV Future, along with the Assignment Agreement and IP Assignment Agreement (collectively, the "Transfer Agreements"), would provide AE the necessary rights to establish an EV charging business in the United States.

**B.  UC and United Leasing First Learned Of AE's Business And Represented That UC Would Support AE's Development Efforts and Participate Only As An Investor**

17.     In or around July 2021, UC learned about AE. UC initially received information regarding AE through a Confidential Information Memorandum ("CIM") provided by Drake Star Partners, an investment banking and advisory firm working with AE.  Upon learning about AE's and Eugene's business plan and vision, UC decided it wanted to participate in AE's business by investing in AE and entering into a strategic collaboration. UC represented to AE and Eugene that it possessed significant resources and strong business relationships, and that it would use its resources and network to support AE's growth, including by offering financing options for AE's customers.  At no point did UC ever convey or even suggest to AE or Eugene that it had any

desire to obtain or exercise partial or full control over any portion of AE or its EV charging business.

18.     Based on UC's representations, in October 2021, AE issued a term sheet for a Simple Agreement for Future Equity ("SAFE Agreement") to offer UC the opportunity to invest in AE's business.

19.     In November 2021, UC and AE signed the SAFE Agreement term sheet. Simultaneously, UC and AE signed a Side Letter Agreement, which contained additional details regarding UC's purchase of equity in AE.  Pursuant to these agreements, UC was obligated to provide funding for the business in return for an ownership interest in AE.   Specifically, section 3 of the Side Letter Agreement provided, in relevant part,

> 3. <u>SAFE Purchase Amount payment</u>. The Purchase Amount shall be payable as follows: (i) $1,000,000 shall be payable simultaneously with the execution of the SAFE Tranche One

20.     Neither of these agreements purported to give UC any control over the business other than its minority ownership interest in AE.

**C.  Once It Secured Its Participation In The Project, UC Took Steps To Implement Its Plan To Take Over AE's Business And Oust Counterclaimants**

21.     At the time that UC represented that it merely sought to invest in AE's business, UC did not disclose, and Counterclaimants could not have known UC's true plan.  UC saw the potential in AE's business. With its knowledge of the EV market in the United States, UC knew that, with the rights to the necessary assets and intellectual property, AE could become extremely profitable. UC did not want to share the benefits or profits with AE and Eugene.  Of course, UC never conveyed its true intentions and beliefs to AE and Eugene, and instead, played its game of gradually finding an "in" before putting its plan into action.

22.     However, UC did not act completely independently.  Rather, at all relevant times, it was in cahoots with its parent company, United Leasing, Inc. ("United Leasing").   Upon

information and belief, UC collaborated with and/or was controlled by or operated as a shell or instrumentality of United Leasing, and at all relevant times, United Leasing appears to have partly and/or completely funded UC's investment in AE.

23.    At all relevant times, United Leasing was fully involved in negotiating the terms of the Side Letter and SAFE Agreements.  It helped define the deal structure, funding schedule, and other collaboration terms.  United Leasing always had extensive operational involvement with the deal.  United Leasing signed the original term sheet for the SAFE Agreement and always had deep operational involvement with the deal.

24.    Indeed, upon information and belief, United Leasing also financially backed UC's litigation against AE and Eugene and was even a named plaintiff when the case commenced. Later, as Counterclaimants successfully moved to have Counter-Defendants' claims against Eugene dismissed, United Leasing was quietly removed as a named plaintiff.

25.    Because UC and United Leasing both collaborated and were involved in these issues relating to AE and Eugene, both companies contributed to the events that occurred, and any corporate separation between UC and United Leasing is not relevant here.

26.    Under the SAFE Agreement and Side Letter Agreement, UC was required to provide $1,000,000 in funding to AE in Tranche 1.  However, after signing those agreements, UC did not provide the required funding.   Rather, UC improperly requested that Counterclaimants submit a list of urgent obligations to address immediately.  Counterclaimants prepared and submitted that list, which totaled $236,200 in expenses.  Counter-Defendants only paid that limited amount, even though they were required to fund $1,000,000. Counter-Defendants' failure to provide AE with the funds it had agreed to provide severely harmed AE and deprived AE of funds it needed for operational expenses and caused projects to

be delayed or postponed, services to clients and investors to be slowed down, and progress in pursuing certification to be further sidetracked. Moreover, the shortage of funding caused by UC and United Leasing created the impression that AE and Eugene were not in control of their business.

27.    In or around December 2021, Counterclaimants began requesting coverage for basic payroll obligations, which amounted to approximately $45,000. Counter-Defendants finally provided those funds, but only after Counterclaimants had to repeatedly request Counter-Defendants' compliance. In sum, Counter-Defendants only ever paid a total of $281,200 of the $1,000,000 of the Tranche 1 payment. These payments originated directly from United Leasing's bank account.

28.    Unbeknownst to Counterclaimants, on information and belief, UC and United Leasing never intended to provide full and complete funding, as required under the Side Letter and SAFE Agreements. Rather, UC and United Leasing strategically planned and acted to use UC's position by virtue of the agreements it executed with AE to access AE's proprietary information and documents, interfere with AE's communications with UL certification personnel and customers, interfere with and steal AE's existing and prospective contracts with vendors and customers, and oust AE's management from the company and the Project.

29.    By way of example, Counterclaimants always had a positive and productive relationship with Nikonov. However, that changed beginning in or around December 2021, just around the time UC solidified its investment in AE. Suddenly, Nikonov began making unsubstantiated and outlandish assertions and accusations and delaying his transfer of assets and intellectual property to AE. Upon information and belief, United Leasing strategized with UC to engage in this misconduct.

30.     Counterclaimants later learned that UC and United Leasing had been secretly planting seeds and false information about Counterclaimants to Nikonov.  In or around December 2021, UC actively took steps to seek out Nikonov.  Prior to that time, UC had never met Nikonov or otherwise had any connection to him.  Rather, on information and belief, UC and United Leasing went so far as to search and find Nikonov on LinkedIn and other sources, and once they found him, they immediately contacted Nikonov in an effort to sabotage AE and Eugene, destroy their relationship with Nikonov, and encourage Nikonov to work with UC and cut AE and Eugene out of the process.  Upon information and belief, United Leasing strategized with UC and was involved in disrupting and undermining AE's relationship with Nikonov.

31.     Counter-Defendants' actions had their intended effect to create a wedge between Nikonov and Counterclaimants.  Suddenly, Nikonov made false claims that two entities he sold to AE, AE LLC/UK and EV Future, were mere shell companies with limited assets.  And, for the first time, Nikonov made additional statements to Counterclaimants asserting that he would improperly withhold assets and/or intellectual property that Nikonov was obligated to transfer to AE, which could undermine AE's and Eugene's ability to develop the Project.

32.     Stirring the pot between Nikonov and Counterclaimants was not the only wrongful act in furtherance of Counter-Defendants' plan.  Counter-Defendants also deliberately interfered with the process that Counterclaimants were pursuing to establish the Project and get AE's EV charging station business up and running.  As part of building the business, Counterclaimants were responsible for ensuring that they received the proper approvals and UL certifications, a requisite precondition to AE's ability to engage in the EV charging station business in the United States.  Obtaining UL certifications for the EV charging stations was a laborious and multi-step process which required significant time, effort and expense on the part

of Counterclaimants. When entering into its business relationship with Counterclaimants, UC had represented that it had experience and expertise in obtaining UL certifications, and accordingly, offered to provide Counterclaimants assistance and advice regarding the same.

33.     Counterclaimants actively and expeditiously worked for months to obtain the proper UL certifications. Eugene and AE delivered hardware samples to the UL testing facility on or around November 2021, and as of January 2022, only two months after the Project was underway, Counterclaimants had already achieved two of the eleven phases for an AC I-Station, a process that takes many months to complete and which requires extensive back-and-forth communication with UL certification personnel.

34.     Unbeknownst to Counterclaimants, while they were proceeding with the UL certification process, in or around November 2022, UC unilaterally intercepted and, without right or reason, improperly instructed UL certification personnel to cease communication with AE and Eugene and to only communicate with UC. UC continued to block and disrupt Counterclaimants' access to the UL certification process and attempted to make UC the only point of contact. Upon information and belief, United Leasing strategized with UC and was involved with this misconduct.

35.     UC had no basis whatsoever to unilaterally remove Counterclaimants from the UL certification and communication process. UC never communicated to Counterclaimants a specific timeframe under which the UL certification process should or would be completed, and Counterclaimants were actively pursuing the certifications and were obtaining the same, based on the consultation and advice provided by UC. UC's interference with AE's certification efforts and the delays it caused furthered the impression that AE and Eugene lacked control over their business and undermined the confidence of customers and investors.

36.     UC did not stop there.  UC also intercepted and interfered with other agreements between AE and third parties. For example, AE entered into an investment banking engagement with Drake Star Partners in mid-2021, under which Drake Star agreed to provide AE various investments and services, and Vitaly Golomb acted as AE's lead advisor. UC later attempted to interfere with AE's relationship with Drake Star and improperly demanded access to AE's confidential information. UC's improper conduct toward Drake Star and AE, together with UC's interference with AE's and Eugene's efforts to obtain UL certifications, AE's governance and operations, communications, and funding of its operations all led Drake Star to terminate its work with AE.

37.      On or about September 30, 2021, AE entered into a Commission Agreement with Chardan Capital Markets LLC ("Chardan"), whereby, in exchange for Chardan's investment in AE and various services, AE agreed to pay a 2.5% commission to Chardan from its net sales.

38.     UC's interference with AE's operations and governance, AE's and Eugene's efforts to obtain UL certifications, AE's communications, and funding of AE's operations all led Chardan to withdraw from its agreement with AE.  AE's investment deals with Drake Star and Chardan were estimated to have a total value of at least $2.5 million.

39.     On or about October 15, 2021, AE entered into a Mutual Non-Disclosure Agreement with EV Plus Corp. ("EV Plus"), and it later entered into a supply-and-lease agreement with EV Plus in or about December 2021 under which AE agreed to provide EV Plus EV charging equipment, software integration, maintenance, and leasing.  The estimated value of AE's supply-and-lease agreement with EV Plus was about $60 million.

40.     Over time EV Plus became concerned about AE's difficulty in obtaining UL certifications and its governance issues, which were attributable to UC's and United Leasing's

interference with AE's operations. Ultimately, based on UC's and United Leasing's interference, EV Plus suspended and later terminated its agreements with AE.

41.    In or around July 2021, Counterclaimants entered into confidentiality and distribution agreements with Hypercharge Networks Corp. ("Hypercharge"), a Canadian client that purchased EV chargers and parts from AE.

42.    In or around October 2021, Hypercharge placed a test order with AE for chargers and related parts.  Hypercharge and AE planned to complete a first deal worth approximately $3 million, and multiple deals after that.

43.    However, UC improperly interfered with AE's relationship with Hypercharge. On information and belief, UC improperly accessed AE's confidential internal sales pipeline and proprietary business information, including confidential information regarding AE's dealings and communications with Hypercharge, and UC used this confidential information to improperly contact Hypercharge directly without authorization. UC's improper actions caused severe disruption to AE's relationship with Hypercharge and led Hypercharge to terminate its agreements with AE.

44.    Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and involved in UC's interference with these contracts and relationships.

**D. As A Direct And Proximate Result Of UC's and United Leasing's Acts And Wrongful Conduct, Counterclaimants Have Suffered Injury**

45.    Counter-Defendants' actions and misrepresentations have had and continue to have deleterious effects on Counterclaimants and have caused them to suffer damages. In addition to depriving Counterclaimants of business opportunities and existing and prospective contracts, Counter-Defendants have tarnished Counterclaimants' reputation. Counter-Defendants have further dragged Counterclaimants through meritless and malicious litigation, as part of their

strategy to oust Counterclaimants from the entire Project. Counter-Defendants' acts have cost Counterclaimants millions of dollars, in addition to damages relating to their tarnished reputation and relationships.

### FIRST CAUSE OF ACTION

**(Intentional Interference With Existing Contractual Relations – Against Counter-Defendants)**

46.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

**AE's Assignment Agreement with Nikonov:**

47.    At all relevant times, AE had valid and binding agreements with third-party Nikonov. Specifically, AE and Nikonov had entered into the Assignment Agreement and various other agreements, whereby Nikonov agreed to transfer current and future assets and intellectual property rights to AE such that AE could develop an EV charging station business in the United States.

48.    At all relevant times, Counter-Defendants knew of the existence of the Assignment Agreement and other agreements.

49.    Counter-Defendants intentionally interfered with AE's agreements with Nikonov. UC improperly and secretly sought out Nikonov and contacted him in an effort to undermine Counterclaimants' reputation, disrupt their relationship with Nikonov, and on information and belief, offer other enticements and/or incentives to Nikonov. UC caused Nikonov to no longer honor the agreement and pursue the business project. Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and involved with UC's interference with this contract.

50. Counter-Defendants' wrongful acts achieved their intended result. As a direct and proximate result of UC's conduct, Nikonov suddenly claimed that the assets and intellectual property he had transferred to AE had limited value, and further decided, contrary to his prior representations and intentions, that he would not, in fact, transfer ownership of various assets and/or intellectual property to AE, thereby undermining Counterclaimants' ability to develop the Project.

51. As a direct and proximate cause of Counter-Defendants' wrongful acts, AE has suffered losses in an amount to be determined at trial but believed to be in excess of $80 million.

**AE's Contract with EV Plus:**

52. Further, at all relevant times, AE had a valid and binding contract with EV Plus. Specifically, on or about December 22, 2021, EV Plus and AE signed a thirty-six month supply-and-lease Letter of Intent and a Mutual Non-Disclosure Agreement ("EV Plus NDA").

53. At all relevant times, Counter-Defendants knew of the existence of AE's supply-and-lease agreement and EV Plus NDA with EV Plus.

54. Counter-Defendants intentionally interfered with AE's contracts with EV Plus.

55. Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and involved with UC's interference with this contract.

56. As a direct and proximate cause of Counter-Defendants' wrongful acts relating to the EV Plus contracts, AE has suffered losses in an amount to be proven at trial, but believed to be in excess of $60 million.

**AE's Contract with Chardan:**

57.     In addition, at all relevant times, AE had a valid and binding contract with Chardan Capital Markets LLC ("Chardan"), whereby Chardan agreed to invest approximately $2.5 million in AE in exchange for commission in the amount of 2.5% of AE's net sales.

58.     At all relevant times, Counter-Defendants knew of the existence of AE's contract with Chardan.

59.     Counter-Defendants intentionally interfered with AE's agreement with Chardan.

60.     Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and behind UC's interference with this contract.

61.     As a direct and proximate result of UC's wrongful acts, AE has suffered losses in an amount to be proven at trial.

**AE's Contract with Drake Star:**

62.     Further, at all relevant times, AE had a valid and binding contract with Drake Star.

63.     At all relevant times, Counter-Defendants knew of the existence of AE's contract with Drake Star.

64.     Counter-Defendants intentionally interfered with AE's contract with Drake Star.

65.     Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and behind UC's interference with this contract.

66.     As a direct and proximate cause of Counter-Defendants' wrongful acts, AE has suffered losses in an amount to be proven at trial.

**AE's Contract with Hypercharge:**

67.     Additionally, at all relevant times, AE had a valid and binding contract with third-party Hypercharge (Canada) ("Hypercharge"), worth approximately $3 million (the "Hypercharge Agreement").  Specifically, AE and Hypercharge entered into a Memorandum of

Understanding and a Confidentiality and Non-Circumvent Agreement (collectively, the "Hypercharge Agreements") on or about January 18, 2022, related to a test order for chargers and related parts.

68.     At all relevant times, Counter-Defendants knew of the existence of the Hypercharge Agreement.

69.     Counter-Defendants took actions to interfere with and disrupt AE's agreements and relationships with Hypercharge.

70.     Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and behind UC's interference with this contract.

71.     As a direct and proximate result of Counter-Defendants' misconduct, AE has suffered losses in an exact amount to be proven at trial, but believed to be in excess of $3 million.

72.     As a direct and proximate result of Counter-Defendants' tortious and intentional interference with AE's existing contracts, AE has suffered and continues to suffer damages, in an amount to be proven at trial.

73.     At all relevant times, Counter-Defendants acted with malice, fraud and/or oppression.  Accordingly, AE is entitled to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Intentional Interference With Prospective Business Relations – Against Counter-Defendants)

74.     Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

75.     At all relevant times, AE and Eugene had an economic relationship with a third party, Nikonov. AE and Eugene planned with Nikonov that Nikonov would transfer various

assets and intellectual property to AE, which would assist AE and Eugene in developing AE's EV charging station business in the United States.

76.    At all relevant times, Counter-Defendants knew about AE's relationship with Nikonov.

77.    Counter-Defendants acted intentionally to disrupt AE's relationship with Nikonov and disrupt AE's ability to acquire assets and intellectual property for AE's EV charging business.  Specifically, UC caused Nikonov to no longer honor his agreements and/or pursue the business project.  Moreover, UC disrupted AE's and Eugene's business and made threats and attempted to coerce Eugene into surrendering AE.  UC also acted to take over the UL certification process by, including but not limited to: discrediting Eugene's and AE's names and integrity and blocking their communication with the UL certification company; attempting to intercept the contracts with Nikonov by requesting that Vitaly Golomb transfer the contracts, as well as other contracts worth over $65 million.

78.    Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and behind UC's interference with this business relationship.

79.    Counter-Defendants' acts achieved their intended results.  As a direct and proximate result of Counter-Defendant's misconduct, the relationship between AE and Nikonov was disrupted.

80.    At all relevant times, AE also had an economic relationship with third-party investors Drake Star and Chardan (the "Investors").

81.    At all relevant times, Counter-Defendants knew of the existence of AE's economic relationship with the Investors.

82.     Counter-Defendants acted intentionally to disrupt AE's relationship with the Investors.

83.     Upon information and belief, United Leasing strategized with UC and was, at all relevant times, aware of and behind UC's interference with this relationship.

84.     As a direct and proximate result of Counter-Defendants' acts, AE has suffered economic damages in an amount to be proven at trial.  Specifically, AE has lost, without limitation, potential investments totaling $2.5 million from the Investors.

85.     Counter-Defendants also took actions to interfere with and disrupt AE's business relationships with Hypercharge and EV Plus.

86.     At all relevant times, Counter-Defendants acted with malice, oppression and/or fraud, and with the intent to damage Counterclaimants.   The foregoing conduct by Counter-Defendants was not privileged.

87.     By reason of this conduct, Counterclaimants are entitled to recover punitive damages in an amount to be proven at trial.

## **THIRD CAUSE OF ACTION**

### **(Breach of Contract – Side Letter Agreement – Against UC)**

88.     Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

89.     At all relevant times, UC and AE were parties to a valid, binding agreement. Specifically, on or about November 15, 2021, the parties entered into the Letter Agreement ("Side Letter Agreement") to supplement the Simple Agreement for Future Equity ("SAFE Agreement") and other related documentation.

90.     Section 3 of the Side Letter Agreement required UC to make a $1,000,000 payment upon execution of the SAFE Agreement.  The SAFE Agreement was executed on or about October 10, 2021.  However, during 2021, UC transferred only $281,200.  The parties had never executed any amendment of the terms of the Tranche 1 payment under the Side Letter Agreement.

91.     At all relevant times, AE did all, or substantially all of the significant things that the Side Letter Agreement required it to do, or it was excused from doing so.

92.     All conditions required for UC's performance occurred or were excused.

93.     Section 3 of the Side Letter Agreement also required UC to work in good faith to develop the required "Draw Schedule" and a "Detailed Use of Funds," as defined in the agreement, to set forth the terms for funding subsequent to the Tranche 1 funding.  UC breached this provision by failing to work in good faith to develop each of these.

94.     Section 3 of the Side Letter Agreement further provided that only a "non-breaching party" may terminate the agreement.

95.     UC also breached the Side Letter Agreement on or about January 28, 2022, when it attempted to terminate the Side Letter Agreement.  Because UC was not a non-breaching party due to its breach of Section 3's terms pertaining to the Tranche 1 payment, it was disqualified from having the ability to terminate the Side Letter Agreement.

96.     As a direct and proximate result of UC's breaches, AE is entitled to recover compensatory damages in an amount to be proven at trial.

97.     Moreover, at all relevant times, UC's conduct was willful and malicious, and committed with the intention of harming AE and Eugene.  Specifically, through the Side Letter Agreement, UC was able to obtain a closer position to AE and its vendors and customers.

Through this position, UC willfully intended to and did seize control of AE's UL certification process, which had been built independently by AE and Eugene. UC cut AE's and Eugene's communication off from UL certification staff and vendors. Moreover, UC used its position gained through the Side Letter to access and retain AE's proprietary documents (including, without limitation, its UL schedule, its bills of materials and CRM, and to interfere directly in AE's business relationships, in particular with its relationship with Nikonov.

98.     Accordingly, AE is also entitled to recover attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

**(Breach of Contract – SAFE Agreement – Against UC)**

99.     Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

100.    At all relevant times, AE and UC were parties to a valid, binding contract. Specifically, on or about November 15, 2021, the parties entered into the SAFE Agreement for a purchase amount of $1,000,000. UC breached the SAFE Agreement by failing to pay the entire $1,000,000, and, without any basis in contract or law, only paid $281,200.

101.    At all relevant times, AE did all, or substantially all of the significant things that the Side Letter Agreement required it to do, or it was excused from doing so.

102.    All conditions required for UC's performance occurred or were excused.

103.    UC's failure to pay the complete $1,000,000 constitutes a material breach. At all relevant times, AE relied on the full funding commitment to operate and grow its EV charging station business.

104.    As a direct and proximate result of UC's material breach, AE has suffered and continues to suffer damages, including the $718,800 shortfall.  Additionally, under 6 Del. C. § 2301, AE is entitled to recover simple interest at a rate of 5%.

### FIFTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing – Against UC)**

105.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

106.    Inherent in every contract is an implied promise of good faith and fair dealing, or, a promise that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

107.    At all relevant times, AE and UC were parties to valid, binding contracts (the Side Letter Agreement and SAFE Agreement).

108.    At all relevant times, AE did all, or substantially all of the significant things that the contracts required it to do, or it was excused from having to do those things.

109.    All conditions required for UC's performance occurred or were excused.

110.    Under the Side Letter Agreement, UC agreed to provide funding under Tranche 1 in the amount of $1,000,000, but only funded $281,200.

111.    UC breached the implied covenant of good faith and fair dealing by intending not to meet its funding obligations under the Side Letter Agreement, and instead, and unbeknownst to AE, intending to use its position gained through the Side Letter Agreement to destroy both AE's business and professional relationships and ultimately take over the Project for itself, while cutting AE and its management out.  Specifically, through its position under the Side Letter and Safe Agreements, UC was able to gain access to AE's vendors and customers, as well as AE's

proprietary documents. UC then inserted itself into the UL certification process—which had been developed independently by AE and Eugene—and use its position to cut AE and Eugene off from communications with its UL certification vendors and customers. Through its position gained from these agreements, UC also interfered directly with AE's economic relationship with Nikonov, ultimately wrongfully causing Nikonov to turn on AE and renege on his promises and agreements. UC further pressured Eugene to relinquish his position at AE.

112.    UC's actions were contrary to the purpose and spirit of the Side Letter and SAFE Agreements and were not done in good faith. In entering into the agreements, UC represented to AE and Eugene that it would use its resources and network to support and promote AE's growth and its successful development of an EV charging station business. However, UC and United Leasing attempted to use the information that AE and Eugene provided them, including certain confidential information, and AE's and Eugene's relationships with Nikonov and various customers to take away AE's business and Eugene's position and to try to develop AE's and Eugene's business and the business relationships for UC's and United Leasing's own benefit. UC and United Leasing in effect attempted to use the information, relationships, and assets AE and Eugene entrusted to them and shared with them to make themselves into competitors and successors to AE and Eugene in the EV charging business field. UC and United Leasing never disclosed that they had such a plan or interest to AE or Eugene.

113.    As a direct and proximate result of UC's acts and breach of the implied covenant, AE has suffered and continues to suffer damages in an amount to be proven at trial. UC is entitled to recover compensatory and consequential damages.

### SIXTH CAUSE OF ACTION

### (Unjust Enrichment – Against Counter-Defendants)

114.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

115.    At all relevant times, Counter-Defendants received a benefit from the business opportunities they wrongfully took from AE, including without limitation: AE's work and project with Nikonov to develop EV charging stations in the United States; AE's contract with Hypercharge; the UL certification process involved in developing EV charging stations; and the lost investments of approximately $2.5 million to AE.  Such acts were particularly wrongful because UC fraudulently and/or negligently mispresented to AE that its only intention with respect to the Project was to invest in AE and to provide expert advice and consulting.

116.    At all relevant times, Counter-Defendants received the benefit of the business opportunities, both existing and prospective, that they usurped from AE, at the direct expense of AE.  Counter-Defendants' acts and usurpation have destroyed AE and Eugene's reputations, cost them millions of dollars, and taken away future livelihood and income from the EV charging stations.

117.    It would be unjust for Counter-Defendants to retain the benefit of these opportunities.

118.    As a direct and proximate result of Counter-Defendants' wrongful acts, AE has suffered and continues to suffer damages.  Accordingly, AE is entitled to recovery of restitution.

### SEVENTH CAUSE OF ACTION

**(Fraudulent/Intentional Misrepresentation – Against Counter-Defendants)**

119.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

120.    Both UC and United Leasing were heavily involved in the negotiation of the deal and Side Letter and SAFE Agreements with AE.

121.    At all relevant times, Counter-Defendants represented to AE and Eugene that UC intended only to serve as an investor in AE's development and pursuit of its EV charging station business, and would not seek to seize control of AE, AE's business or AE's customers. Counter-Defendants further falsely represented that UC would fully support and provide assistance to AE and Eugene's efforts to develop an EV charging station business that AE and Eugene would own, control, and operate. Counter-Defendants also falsely represented that UC would fulfill its funding obligations under the Side Letter and SAFE Agreements.

122.    Counter-Defendants' statements were false representations of material fact. In reality, Counter-Defendants never intended to fully provide funding to AE, and instead, intended to use those agreements to gain access to AE and its proprietary information and business contacts in order to take control of AE, profit and benefit from the Project themselves, and cut Eugene and AE out of the project entirely. Indeed, contrary to UC's misrepresentations, Counter-Defendants intended to seize control of AE's and Eugene's EV business for themselves and exclude AE's management from dealing with customers, vendors, UL certification personnel and others. Counter-Defendants also wrongfully directed UL certification personnel to cease communicating with AE and Eugene and sought to replace AE's management with UC's own management. Counter-Defendants' representations relating to UC not having any plan to launch its own charging business (when, in fact, it planned all along to oust AE from the Project and take it over itself) were materially false.

123.    At all relevant times, Counter-Defendants made these misrepresentations of material fact with knowledge of their falsity and with the intent to induce Counterclaimants'

reliance thereon, as their reliance would permit Counter-Defendants to get closer to the Project and to ultimately take control of the same, while ousting Counterclaimants.

124.    At all relevant times, Counterclaimants relied on Counter-Defendants' misrepresentations.  AE entered into the Side Letter and SAFE Agreements with UC, allowed Counter-Defendants to make financial contributions to the project under the false belief that Counter-Defendants would not later attempt to use such contributions as a means for ousting Counterclaimants and developing their own business.

125.    At all relevant times, Counterclaimants' reliance on Counter-Defendants' misrepresentations was justifiable.  Counter-Defendants never gave Counterclaimants any reason to know of their true intention, as the conversations and acts discussed herein, including but not limited to conversations with Nikonov and with the UL certification personnel, were conducted secretly and without Counterclaimants.  Specifically, neither Eugene nor AE were ever shown any documents from Counter-Defendants which criticized Eugene and AE, Counter-Defendants never communicated to AE or Eugene that it intended to act to replace Eugene as CEO of Eugene, an act to which Eugene never would have agreed, and, Counter-Defendants never consulted with AE or Eugene over the fact that Chris Riley (or anyone) would temporarily serve as CFO of AE.

126.    As a direct and proximate result of Counter-Defendants' misrepresentations, Counterclaimants have suffered and continue to suffer damages in an amount to be proven at trial.

127.    The conduct of Counter-Defendants was intended to cause injury to Counterclaimants and was intentionally fraudulent, malicious and oppressive.  Accordingly,

Counterclaimants are entitled to receive an award of punitive and/or exemplary damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation – Against Counter-Defendants)

128.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

129.    At all relevant times, Counter-Defendants negligently represented that UC intended only to serve as an investor in connection with AE's efforts to develop and build an EV charging station business in the United States, and would not seek to seize control of AE, AE's business or AE's customers. Counter-Defendants further negligently represented that UC would fully support and provide assistance to AE and Eugene's efforts to develop an EV charging station business that AE and Eugene would own, control, and operate. Counter-Defendants also negligently represented that UC would fulfill its funding obligations under the Side Letter and SAFE Agreements.

130.    At all relevant times, Counter-Defendants acted negligently in stating these intention, and these statements constituted misrepresentations of material fact.  In reality, Counter-Defendants intended to take control of AE, profit and benefit from the project itself, and cut Eugene and AE out of the deal, including by excluding AE's management from dealing with customers, vendors, UL certification personnel and others. Moreover, Counter-Defendants intended that UC would not fulfill its funding obligations under the Side Letter and SAFE Agreements.

131.    Counter-Defendants also misrepresented to customers and investors that AE and Eugene were not capable of handling the UL registration issues.

132.    At all relevant times, Counterclaimants had reasonable grounds to believe the truth of Counter-Defendants' misrepresentations.

133.    At all relevant times, Counter-Defendants intended to induce Counterclaimants' reliance on its misrepresentations, as their reliance would permit Counter-Defendants to get closer to the project and to ultimately take control of the same, while ousting Counterclaimants.

134.    At all relevant times, Counterclaimants relied on Counter-Defendants' misrepresentations.  AE entered into the Side Letter and SAFE Agreements with UC, allowed Counter-Defendants to make financial contributions to the project under the false belief that Counter-Defendants would not later attempt to use such contributions as a means and justification for ousting Counterclaimants, permitted UC to be involved in communications with AE's customers, vendors and UL certification personnel under the false belief that UC was only acting as an investor.

135.    At all relevant times, Counterclaimants' reliance on Counter-Defendants' misrepresentations was justifiable.  Counter-Defendants never gave Counterclaimants any reason to know of their true intention, as the conversations and acts discussed herein, including but not limited to conversations with Nikonov and with the UL certification personnel, were conducted secretly and without Counterclaimants.

136.    As a direct and proximate result of Counter-Defendants' misrepresentations, Counterclaimants have suffered and continue to suffer damages in an amount to be proven at trial.

### <u>NINTH CAUSE OF ACTION</u>

**(Unfair Business Practices in Violation of California Business & Professions Code § 17200, _et seq._ – Against Counter-Defendants)**

137.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

138.    As alleged above, Counter-Defendants have engaged in unlawful and fraudulent acts, including but not limiting to: wrongfully removing Eugene as CEO of AE without authority; failing to consult with Eugene or AE in installing Chris Riley as temporary CFO of AE, improperly and wrongfully taking over the UL certification process and directing personnel to communicate only with Counter-Defendants and not, rather, with Counterclaimants, intentionally, maliciously and oppressively making false representations that Counter-Defendants only intended to consult and/or advise Counterclaimants as they worked on the Project, while concealing the fact that they, in fact, intended to take control of the project and oust Counterclaimants, stealing existing and prospective business contracts and relationships from Counterclaimants, [and by defaming and tarnishing Counterclaimants' reputation and ability to conduct business in the EV market,

139.    Counter-Defendants undertook the acts described herein, and such other acts as many be established at trial, with the intent to injure Counterclaimants.

140.    As a direct and proximate result of Counter-Defendants' unlawful conduct, Counterclaimants have suffered and will continue to suffer substantial actual losses in an amount to be proven at trial.

141.    Accordingly, Counterclaimants are entitled to restitution of all sums unfairly and unjustly obtained by Counter-Defendants.

## TENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against UC)

142.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

143.    At all relevant times, UC owed a fiduciary duty of loyalty and care to Counterclaimants.  UC assumed the role of expert and advisor to Counterclaimants, and thus had a duty to, at all relevant times, act in the best interests and for the benefit of Counterclaimants.

144.    UC breached its fiduciary duties to Counterclaimants as follows (without limitation):

    a.  Falsely and knowingly misrepresenting to Counterclaimants that it would only serve as an investor and advisor and had no intention of participating in the project, even though it sought to take control over AE and effectively displace AE's management and replacing it with UC's own management;

    b.  By discrediting AE and its management to Nikonov and destroying AE's existing and expected economic relationship with Nikonov, and thus inhibiting AE's ability to develop its EV charging station business;

    c.  By secretly and wrongfully directing UL certification personnel to cease communicating with Counterclaimants and only deal with Counter-Defendant directly;

    d.  By acting to wrongfully take over AE and discredit and displace its management, and

    e.  By knowingly and intentionally destroying Counterclaimants' business relationships, including its expected Hypercharge contract, expected investments from Chardan and Drake Star amounting to approximately $2.5 million, its contract with EV PLUS worth $60 million.

145.    As a direct and proximate result of UC's wrongful acts, Counterclaimants have been deprived of over $60 million.   Counterclaimants are entitled to recover compensatory damages, punitive damages, prejudgment interest, and restitution.

### ELEVENTH CAUSE OF ACTION

**(Aiding and Abetting Breach of Contract – Against United Leasing)**

146.    Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

147.    As discussed above, UC owed contractual duties and obligations to AE under the Side Letter and SAFE Agreements, which UC breached by failing to provide the $1,000,000 in funding under Tranche 1.  UC further breached Section 3 of the Side Letter Agreement by failing to develop a Draw Schedule and Detailed Use of Funds, and by attempting to terminate the agreement when it was not qualified to do so.

148.    Counter-Defendant United Leasing has aided and abetted in UC's breaches of its obligations under the SAFE and Side Letter Agreements.  Specifically, upon information and belief, United Leasing participated in inducing and/or encouraging UC to breach its obligations, and instead focus on using its position gained from the execution of those agreements to take over AE's business and oust it from the Project, all while destroying Counterclaimants' reputation and business, while limiting its own financial involvement in the process.  Indeed, at all relevant times, United Leasing controlled the funding that was provided to AE, as it was the source of payment for the funds that were provided.

149.    By assisting and inducing UC to breach its obligations under the Side Letter and SAFE Agreements, United Leasing has aided and abetted UC in its breaches and wrongdoing.

150.    There was no privilege or justification for United Leasing's conduct.

151.   United Leasing's conduct, as set forth herein, has been willful and malicious.

152.   As a direct and proximate result of United Leasing's aiding and abetting UC's breaches of contract, Counterclaimants have suffered injury, continue to suffer injury and will suffer injury, for which there is no adequate remedy at law, and thus are entitled to permanent injunctive relief and to actual consequential and punitive damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty – Against United Leasing)

153.   Counterclaimants reallege and incorporate the above allegations as if fully set forth herein.

154.   At all relevant times, UC was in a fiduciary relationship with Counterclaimants, and UC owed a fiduciary duty of loyalty and care to Counterclaimants.  UC assumed the role of expert and trusted advisor to Counterclaimants, and thus had a duty to, at all relevant times, act in the best interests and for the benefit of Counterclaimants.

155.   UC breached its fiduciary duties of loyalty and care to Counterclaimants by, without limitation:

a.   Falsely and knowingly misrepresenting to Counterclaimants that it was investing in the project and providing its expertise, but not taking control over AE and/or ousting AE's management and replacing it with UC's own management;

b.   By discrediting AE and its management to Nikonov and undermining AE's existing and expected relationship with Nikonov, and thus inhibiting AE's ability to develop its EV charging station business;

c.  By secretly and wrongfully directing UL certification personnel to cease communicating with Counterclaimants and only deal with UC directly;

d.  By acting secretly and wrongfully to take over AE and try to discredit and/or remove its management,; and

e.  By knowingly and intentionally damaging Counterclaimants' business relationships, including its expected Hypercharge contract, worth at least $3 million or more, expected investments from Chardan and Drake Star and other investors amounting to approximately $2.5 million, and its contract with EV PLUS worth $60 million.

156.  At all relevant times, United Leasing had actual and/or constructive knowledge of UC's fiduciary duties to Counterclaimants and was heavily involved in structuring and negotiating the deal and relationship between Counterclaimants and UC.

157.  At all relevant times, United Leasing knowingly and willfully participated in UC's breach of its fiduciary duties and was directly involved in UC's failure to fully meet its funding obligations.  At all relevant times, United Leasing was in cahoots with UC, and United Leasing engaged in a scheme to position UC to take over AE's EV charging station business by using AE's proprietary information, its vendor and customer contacts  United Leasing's aiding and abetting in UC's breach of its fiduciary duties is further apparent by the fact that United Leasing quietly distanced itself from the litigation in order to shield itself from liability and exposure.

158.  As a direct and proximate result of United Leasing's aiding and abetting UC, Counterclaimants have suffered and continue to suffer damages, in an amount to be proven at trial.

159.    United Leasing acted willfully, intentionally and maliciously, such that Counterclaimants are entitled to recover compensatory damages, disgorgement of any profits gained by UC and/or United Leasing due to UC's breach of its fiduciary duties, punitive damages, prejudgment interest, and restitution.

**WHEREFORE**, Counterclaimants pray for judgment against Counter-Defendants as follows:

1. On the First Cause of Action, compensatory damages and punitive damages;

2. On the Second Cause of Action, compensatory damages and punitive damages;

3. On the Third Cause of Action, compensatory damages, attorneys' fees, and costs;

4. On The Fourth Cause of Action, compensatory damages, attorneys' fees and costs;

5. On the Fifth Cause of Action, compensatory damages and consequential damages;

6. On the Sixth Cause of Action, restitution;

7. On the Seventh Cause of Action, actual damages and punitive and/or exemplary damages;

8. On the Eighth Cause of Action, actual damages and consequential damages;

9. On the Ninth Cause of Action, restitution.

10. On the Tenth Cause of Action, compensatory damages, punitive and/or exemplary damages, prejudgment interest, and restitution.

11. On the Eleventh Cause of Action, disgorgement of profits, compensatory damages, lost profits, and punitive damages.

12. On the Twelfth Cause of Action, disgorgement of profits, compensatory damages, lost profits, and punitive damages.

Date: May 26, 2025                         **RIMON, P.C.**

                                           By: */s/ Richard de Bodo*
                                               Richard de Bodo (*pro hac vice*)
                                               California State Bar No. 128199
                                               rdebodo@rimonlaw.com
                                               2029 Century Park East, Suite 400N
                                               Los Angeles, CA 90067
                                               Telephone: (310) 943-7301

                                               Attorneys for Auto Enterprise TIG, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2025, I electronically filed with the Clerk of the U.S. District Court, Southern District of Indiana, Evansville Division, the foregoing Motion to Dismiss, by using the CM/ECF system, which will send notification of such filing to all counsel of record.

                                           */s/ Richard de Bodo*
                                           Richard de Bodo